UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
MICHAEL BALLANTINE and                              Civ. Action No: 26-cv-4069
LISA BALLANTINE,

                Plaintiff,                              **FIRST AMENDED**
                                                 **VERIFIED COMPLAINT**

                -against-

MICHAEL PAGAN,

                Defendant.
--------------------------------------------------------X

       Plaintiffs, MICHAEL and LISA BALLANTINE (herein collectively "Plaintiff"), by their attorneys, The Linden Law Group, P.C., as and for their Amended Complaint against the Defendant MICHAEL PAGAN, ("Defendant" or "Mr. Pagan"), allege as follows:

       1)     This action arises from a coordinated commercial campaign by Defendant Michael A. Pagán, a New York–domiciled investor and business owner with documented acquisition interests in the targeted enterprise, against the Jamaca de Dios development, the JAMACA DE DIOS JARABACOA mark, and Plaintiff Michael J. Ballantine, the developer who has built and operated the enterprise for more than twenty-one years.

       2)     Plaintiff Michael J. Ballantine, as sole owner of the Mark, brings two claims under the Lanham Act: Count I for false advertising under 15 U.S.C. § 1125(a)(1)(B), and Count II for false designation of origin, sponsorship, and affiliation under 15 U.S.C. § 1125(a)(1)(A). Plaintiffs Michael J. Ballantine and Lisa Ballantine bring related New York state-law claims for defamation per se, trade libel and commercial disparagement, tortious interference with existing contract, and tortious interference with prospective business relations.

1

3)      The Complaint pleads common factual allegations applicable to all counts, followed by Counts I and II under the Lanham Act and Counts III through VI under New York law.

**JURISDICTION AND PARTIES**

4)      This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. §1331, because the matter in controversy involves a federal question under 15 U.S.C. § 1125(a), et seq. This Court has further subject matter jurisdiction over Counts III through VI pursuant to 28 U.S.C. § 1332(a)(1); the matter in controversy exceeds $75,000 exclusive of interest and costs and is between citizens of different States, Plaintiffs domiciled in Florida and Defendant domiciled in New York.

5)      The venue of this action is proper in this judicial district because the sole Defendant resides within the Southern District of New York, pursuant to 28 U.S.C. §1391(b)(1).

6)      "Plaintiffs are natural persons over eighteen years of age, are husband and wife, and are citizens of and domiciled in Collier County, Florida."

7)      Defendant MICHAEL PAGÁN is a natural person over the age of eighteen and is a citizen of and domiciled in the State of New York, residing in Rye, Westchester County, New York, within this District.

**COMMON FACTUAL ALLEGATIONS**

**A. Plaintiffs, the Mark, the Development, and the Enterprise**

8)      Plaintiff Michael J. Ballantine is an individual domiciled in Naples, Florida. He is the founder, developer, administrator, and commercial face of the Jamaca de Dios residential and development enterprise (the "Enterprise"), a mountainside development in Palo Blanco, Jarabacoa,

2

Dominican Republic (the "Development"), which Plaintiff Ballantine has built, operated, administered, and marketed continuously for more than twenty-one years.

9)    Plaintiff Lisa Ballantine is an individual domiciled in Naples, Florida. She is the spouse of Plaintiff Michael J. Ballantine and joins this action as co-plaintiff on the state-law claims pleaded herein.

10)    Plaintiff Ballantine is the sole owner of the JAMACA DE DIOS JARABACOA trademark, Registration No. 185133, registered in 2005 and continuously maintained since (the "Mark"), together with the goodwill accumulated from more than twenty-one years of continuous commercial use. The Mark is held by Plaintiff Ballantine in his personal name as a personal capital asset, not through any corporate entity. Plaintiff Ballantine alone holds Lanham Act standing as Mark owner.

11)    In the relevant market, the Development, the Enterprise, and the Mark are commonly known simply as "Jamaca de Dios." In investor communications, customer-facing materials, and media coverage, those words identify a single commercial source: Plaintiff Ballantine's Enterprise.

12)    The Jamaca de Dios complex comprises ninety-five residential properties, luxury villas, common areas, the Jamaca de Dios restaurant, and the Mountain Lodge expansion component. The Development sits within the Baiguate National Park ecotourism zone and has been developed under the Baiguate management plan, which the Dominican Ministry of Environment has approved. Every home approved for construction at Jamaca de Dios is approved by Plaintiff Ballantine's company Jamaca de Dios as exclusive developer, and by the Ministry of Environment and the Municipality of Jarabacoa. The Mountain Lodge expansion holds Ministry of Environment and Ministry of Tourism approvals under the Baiguate management plan. The

Jamaca de Dios restaurant features the only 360-degree rotating floor in the Dominican Republic and is a destination dining venue widely recognized in the regional luxury hospitality market. The Mark and the Enterprise have been marketed continuously since inception to an international purchaser community of Dominican-resident, United States-resident, and European, Caribbean, and North American buyers.

13)     Plaintiff Ballantine began developing Jamaca de Dios more than twenty-one years ago. When he acquired the land in 2003, the mountain was abandoned, without public access roads, electricity, or infrastructure. Plaintiff Ballantine built the access roads, brought in electricity, and created the internal infrastructure from raw ground. The Mark was the founding identity of the Enterprise, not a label added later. Plaintiff Ballantine selected and registered the Mark in 2005.

14)     Plaintiff Ballantine has sold at least fifteen properties to purchasers domiciled in the New York metropolitan area and at least fifteen more to purchasers from other parts of the United States. The diaspora purchaser and investor community of New York residents of Dominican descent (the "Diaspora Market") is a recurring and established United States-linked market for the Mark and the Enterprise.

15)     Within the upper section of the Jamaca de Dios complex, Plaintiff Ballantine designated and named a small semi-private subsection "The Heights" — a seven-property enclave adjacent to the Jamaca de Dios restaurant. The Heights is a discrete subsection within the larger upper section of the Development, not the upper section in its entirety. The naming draws the deliberate connection between the high-altitude Dominican mountain section and Washington Heights, the historic and demographic center of the New York Dominican-American community, and reflects Plaintiff Ballantine's longstanding commercial intent to attract the New York-resident

4

Dominican-American purchaser community to the Enterprise. Defendant himself owns multiple properties within The Heights subsection.

**B. The Association and the Administration Agreement**

16)     Three distinct roles existed within the Development: Plaintiff Ballantine, as exclusive developer and administrator of the Enterprise and as sole owner of the Mark; the Jamaca de Dios restaurant, as one public-facing hospitality component of the Enterprise; and the Asociación de Propietarios Residencial Jamaca de Dios (the "Association"), a nonprofit residents' association with a limited community-facing role.

17)     From the inception of the Development in 2003, Plaintiff Ballantine held all developer authority over the Jamaca de Dios complex, including all construction approvals, all plan reviews, all permit verification, all inspections, and all authorization of third-party permits, and exclusive commercial and expansion rights. In 2015, Plaintiff Ballantine and the Association entered the Administration Agreement, by which Plaintiff Ballantine delegated to the Association limited maintenance, vigilance, and common-area functions. The Administration Agreement confirmed and expressly preserved Plaintiff Ballantine's exclusive developer authority — including all construction approvals, plan reviews, permit verification, inspections, and authorization of third-party permits — in Article One. The Administration Agreement names the Mountain Lodge expansion by name as a contemplated Plaintiff expansion. The Administration Agreement expressly recognizes Plaintiff Ballantine's exclusive ownership of additional adjacent land as a projected second phase of the Development. The Administration Agreement expressly prohibits the Association from participating in any other project or for-profit enterprise. The Administration Agreement has never been amended, modified, or superseded. No transfer of Plaintiff Ballantine's developer rights has ever occurred.

18)     Plaintiff Ballantine personally provided Defendant with copies of the Administration Agreement on several occasions and discussed its terms with Defendant directly. Defendant openly rejected the limitations the Administration Agreement placed on the Association's authority. Defendant therefore had actual knowledge of the contractual limitation on the Association's authority and acted in conscious disregard of it. All titles to common areas of the Development are held in the name of Jamaca de Dios.

19)     The Association previously held a Dominican commercial-name registration under the name "Asociación de Propietarios del Residencial Jamaca de Dios." That registration was held in the name of a third party who departed the Development years ago. Defendant has never personally held any right, title, or interest in that registration. The recorded scope of the registration was nonprofit residents'-association activity. The registration expired on March 4, 2024. Under the relevant rules, the registration could be renewed only within a six-month grace period, which ended on September 4, 2024. The registration was not renewed within that window and could not be recovered after it. As of September 5, 2024, no person held any recoverable registered right in the Association designation.

## C. Defendant Pagán: New York Domicile and Documented Commercial Acquisition Objective

20)     Defendant Michael A. Pagán is a citizen of the United States and is domiciled at 10 Woods End, Rye, New York 10580. Rye, New York is Defendant's true, fixed, and permanent home and principal establishment, and is the place to which Defendant intends to return whenever absent. The center of Defendant's domestic, social, civic, and commercial life is in New York. Defendant's family resides with him in Rye, New York, and does not reside at the Jamaca de Dios development. Defendant owns and operates healthcare businesses in the New York metropolitan

area. Defendant's day-to-day commercial and personal affairs, his financial relationships, and his social and civic activities are conducted from New York. Defendant's physical presence at the Development in the Dominican Republic is limited to short periodic visits. Defendant is a citizen of New York for purposes of this action.

21)    Defendant owns four residential properties and one undeveloped lot within the seven-property semi-private Heights subsection of the Jamaca de Dios complex, with offers pending on the remaining two villas in The Heights, reflecting Defendant's stated objective of acquiring the entire semi-private subsection. Defendant has repeatedly described those acquisitions, and his planned use of them, in commercial terms, including in connection with bringing medical professional groups associated with his New York healthcare businesses to the complex — groups whose presence at the Enterprise was good for Defendant's New York businesses — and with converting the restaurant component to a commercial operation under his control. These facts place Defendant in a commercial relationship to the Enterprise beyond that of an ordinary homeowner.

22)    Defendant's commercial posture toward the Enterprise has been documented in his own words from November 2021 forward. In November 2021, Defendant told Plaintiff Ballantine in writing that the Development "has a wonderful name (thanks to you)," expressly crediting Plaintiff Ballantine as the source of the Mark, and that Defendant wanted his "property to grow in value Bc of the name," expressly identifying the Mark as the source of commercial value driving Defendant's own real estate appreciation. In the same exchange, Defendant told Plaintiff Ballantine that he "want[ed] a seat at the board especially on the financial side.

23)    In January 2022, Defendant told Plaintiff Ballantine how he proposed to address the governance of the Enterprise in two words: "How to take over 'buy.'" In July 2023, Defendant

7

told Plaintiff Ballantine, "I'll create a company as a management firm and we manage it," and, in the same exchange, "We will take back the mountain you built and moving it into the future." In October 2023, in response to Plaintiff Ballantine's direct question whether to intervene in contested Association governance, Defendant told Plaintiff Ballantine in writing, "Let it flow and we take it over." In February 2024, after Plaintiff Ballantine sent Defendant the restaurant operator's amortization schedule and observed that the ownership structure was "not good for a takeover," Defendant responded in writing, "He would have to default," identifying forced default of the restaurant operator as the acquisition mechanism approximately fifteen months before the May 2025 publication campaign.

24)    Throughout the period of Defendant's documented acquisition objective, Defendant repeatedly asked Plaintiff Ballantine to approach the operator of the Jamaca de Dios restaurant about selling the restaurant to Defendant. At Defendant's request, Plaintiff Ballantine approached the restaurant operator about a sale on multiple occasions — in person and by other means, beginning in 2021 at Defendant's home in Rye, New York and continuing throughout the relevant period. The operator of the Jamaca de Dios restaurant is expected to testify that not only Defendant but other persons identified in this Complaint approached him about selling the restaurant on multiple occasions, individually and together, in various settings. Separately, two members of the directive of the Association then serving with Defendant approached Plaintiff Ballantine and proposed to acquire large portions of Plaintiff Ballantine's undeveloped land within the Development. Plaintiff Ballantine declined those approaches.    During the period of Defendant's documented acquisition objective, persons acting in coordination with Defendant separately approached the operator of the Jamaca de Dios restaurant about selling the restaurant to Defendant, before and after the May 18, 2025 publication campaign.    Those persons are Williams

8

Jimenez, Ivan Noboa Diaz, Ricardo Cucurullo, and Jonathan Gutierrez, each of whom is identified as a person with knowledge of facts relevant to the matters alleged herein at ¶73 below and is expected to testify as a fact witness regarding the approaches, the substance of the discussions concerning the restaurant's sale to Defendant, and the absence of any warning of structural danger communicated to the restaurant operator before May 18, 2025.  Throughout the entire period of these approaches and at all times preceding April 4, 2025, Defendant never expressed to Plaintiff Ballantine — the developer who built the Enterprise — any environmental, structural, safety, or developmental concern of any kind regarding the Jamaca de Dios complex, the restaurant, the Mountain Lodge expansion, or any other component of the Development.

25)    On July 30, 2023, when Plaintiff Ballantine was in New York for business with a recent purchaser of the Enterprise, Defendant invited Plaintiff Ballantine to dinner at Defendant's home at 10 Woods End, Rye, New York. At that dinner, on United States soil, Defendant told Plaintiff Ballantine that he intended to acquire the Jamaca de Dios restaurant; that he intended to tear the restaurant down; and that he intended to replace it with an internationally famous "South Beach-style" club. The acquisition objective Defendant articulated at the July 30, 2023 dinner — acquisition, demolition, and replacement — is consistent with the prior written acquisition statements pleaded above, with Defendant's continuing communications described below, and with Defendant's May 24, 2025 written communication to Plaintiff Ballantine pleaded at ¶44 below.

26)    During the same period, Defendant described himself to Plaintiff Ballantine as the largest commercial consumer of the Enterprise, bringing New York-based medical professional groups to the Jamaca de Dios complex on a recurring basis. The groups were drawn from the New York metropolitan area — the same New York-resident Dominican-American community that constitutes the Enterprise's recurring United States-linked purchaser and investor market. On at

least two documented occasions, Defendant informed Plaintiff Ballantine that he had ceased bringing those groups to Jamaca de Dios and had redirected them to a competing hospitality and residential development operating in the same niche market in Jarabacoa. Defendant withdrew actual revenue-generating commercial patronage from the Enterprise and redirected it to a competing developer in the same market. Taken together, Defendant's residential holdings within the Enterprise, his use of the Enterprise as lodging inventory and amenity infrastructure for his New York-based commercial relationships, his redirection of that patronage to a competing developer in the same Jarabacoa luxury market, and his stated plans to acquire and operate the restaurant component as his own commercial platform place Defendant in the position of a competitor of, and commercial actor toward, the Enterprise.

**D. Defendant's False Projection of Institutional Authority**

27)    Plaintiff Ballantine personally built the Jamaca de Dios restaurant. Plaintiff Ballantine directly supervised the construction of all villas constructed within the Jamaca de Dios complex, and personally built two of Defendant's villas at Jamaca de Dios. Over more than three years of continuous direct dialogue with Plaintiff Ballantine — including multiple in-person meetings both in New York and in the Dominican Republic, first at Defendant's home in Rye on July 30, 2023 and later at the May 14–16, 2025 Banreservas trade show in Washington Heights described below — Defendant never expressed any environmental, safety, structural, or construction-integrity concern regarding the Jamaca de Dios complex to the developer who had built it. Defendant's first and only allegations of mountain collapse risk, structural failure, illegal construction, environmental destruction, and catastrophic danger appeared in the unauthorized April 4, 2025 letter and in the coordinated May 18, 2025 publication campaign three days after the May 15 Washington Heights meeting.

28)     Prior to April 2025, the Association was governed by a board on which the operator of the Jamaca de Dios restaurant had been democratically elected to serve. After attending one meeting of that board, Defendant caused the restaurant operator to be removed without notice, without formal proceeding, without any vote, and without any lawful institutional basis. On or about March 17, 2025, the then-sitting president of the Association hastily resigned, citing personal reasons. Other directors likewise resigned. The board collapsed.

29)     On April 4, 2025 — eighteen days before Defendant claimed any institutional office, and at a time when the board had collapsed — a letter was issued on Association letterhead, sealed with the Association's institutional stamp, and transmitted to local municipal authorities. The April 4, 2025 letter was issued without any board resolution, membership vote, or other lawful institutional authorization. The letter falsely asserted that Plaintiff Ballantine had sold the entire Jamaca de Dios project; that Plaintiff Ballantine "legally lacks purpose" as the developer of the Enterprise; that Plaintiff Ballantine lacked the quality to continue developing the project he had founded, named, registered, and built; that the Association had formal standing to oppose developer plan approvals; and that continued construction could cause structural collapse and environmental damage. The April 4 letter further cited Plaintiff Ballantine's own covenants and restrictions — governance instruments Plaintiff Ballantine had drafted and that bind property owners through their purchase contracts with Plaintiff Ballantine — as if those covenants belonged to and were enforced by the Association. The Association never adopted those covenants. Each of these assertions was false. The December 8, 2025 letter, which Defendant transmitted from his New York domicile and which was issued under the institutional identity Defendant controls as president of the Association from his Rye, New York domicile, repeated and amplified the same false assertions, supporting the inference that the April 4, 2025 letter was Defendant's act.

11

30)     On April 22, 2025, eighteen days after the April 4 letter was already in circulation, Defendant announced his self-appointment as interim president of the Association. The self-appointment was not the product of any membership vote, election, or board resolution. It followed no procedure authorized by the Association's bylaws for the appointment of an officer. The challenged acts Defendant took in the name of the Association from April 22, 2025 forward were taken under a title Defendant had assumed unilaterally.

31)     Defendant nevertheless used the Association's name, logo, letterhead, rubber stamp, RNC number, and the Jamaca de Dios designation in the April 4, 2025 letter, the denuncias and petitions transmitted to senior officials of the Dominican government and to multiple Dominican government institutions in the days immediately preceding May 18, 2025, the May 18, 2025 publication campaign, the December 8, 2025 letter, and the March 3, 2026 invoice. The April 4, 2025 letter was transmitted seven months after the Association's commercial-name registration had expired and could not be recovered. The December 8, 2025 letter was transmitted fifteen months after that registration had expired and could not be recovered.

32)     Within the first weeks following his April 22, 2025 self-appointment as interim president of the Association, Defendant brought personal counter-lawsuits against several Jamaca de Dios property owners who had previously sued the prior board demanding financial accountability for the use of Association funds. The May 24, 2025 written communications between Plaintiff Ballantine and Defendant pleaded below occurred against this litigation backdrop.

**E. The May 14–16, 2025 Banreservas Trade Show in Washington Heights, New York**

33)     From May 14 through May 16, 2025, Banreservas — a state-owned bank of the Dominican Republic — convened the Feria Inmobiliaria Banreservas New York 2025, a real estate

investment trade show held at the Radio Hotel, 500 West 181st Street, New York, NY 10033, in Washington Heights, New York. Banreservas described the purpose of the trade show as giving the Dominican diaspora and investors in the United States the opportunity to finance the purchase of homes in the Dominican Republic through Banreservas-supported financing offerings. Plaintiff Ballantine attended the trade show to pursue United States-linked commercial relationships for the Enterprise and the Mark within the same Diaspora Market the Enterprise has served continuously for twenty-one years. Defendant traveled to the trade show from his domicile in Rye, New York.

34)     Among the developer offerings at the trade show was The Elements, a luxury condominium project located immediately outside the gate of the Jamaca de Dios complex and directed at the same diaspora investor community the trade show had been convened to reach. At the Radio Hotel during the trade show, in Defendant's presence, the principal of The Elements stated that units were actively selling and that he was willing to undertake the Mountain Lodge expansion as a separate engagement. The Elements is, as of the date of this filing, an ongoing and visible commercial construction project at the entrance of the Jamaca de Dios complex — on the same mountain Defendant's publications would three days later claim to be structurally unsafe and to require demolition.  On May 15, 2025, Defendant was physically present with Plaintiff Ballantine and David Almanzar, a United States citizen engineer-developer then actively building The Elements at the entrance of Jamaca de Dios and the active candidate to construct the Mountain Lodge; Defendant raised no safety concern about the mountainside, yet three days later disseminated publications claiming imminent collapse.  Defendant raised no concern of any kind in response to any portion of the introduction — no concern about soil stability, permits, structural integrity, alleged illegal construction, or the Association's position on the Mountain Lodge or on the neighboring development.

13

35)     In a continued conversation at the trade show on May 15, 2025, Defendant stated directly to Plaintiff Ballantine, on United States soil: that he intended to destroy the operator of the Jamaca de Dios restaurant; that he had engaged lawyers in Santo Domingo who were already carrying out his orders on an operational campaign against the Enterprise; that there was nothing Plaintiff Ballantine could do to intervene or to stop it; that Defendant would deploy one Dominican government agency after another against the Jamaca de Dios restaurant; that if Plaintiff Ballantine attempted to interfere, Defendant would come after Plaintiff Ballantine as well; that if Plaintiff Ballantine aligned himself with the restaurant operator, Plaintiff Ballantine would face consequences; that if Plaintiff Ballantine filed suit, Defendant would bring additional lawsuits against him; and that "the friend of my enemy is my enemy." Defendant further stated, in the same conversation on United States soil, that his properties at Jamaca de Dios would be worth approximately twelve million dollars — a valuation premised on the commercial conditions Defendant intended to bring about. Three days later, on May 18, 2025, the coordinated publication campaign was activated and disseminated in materially the form Defendant had announced on United States soil. Knowing that Defendant was determined to acquire the restaurant and was escalating his posture, Plaintiff Ballantine asked Defendant whether Plaintiff Ballantine could intervene and speak with the restaurant operator about a possible sale without further acceleration of the conduct Defendant had announced, and expressed his own concern about the corporate culture of the Enterprise. Defendant told Plaintiff Ballantine in substance that there was nothing Plaintiff Ballantine could do. The exchange marked a strategic pivot — from a contemplated commercial acquisition to a campaign of pressure directed at compelling the restaurant operator's exit from the Enterprise.

36)     The May 18, 2025 publication campaign was the culmination of a documented escalation conceived and directed by Defendant from his United States domicile in Rye, New York. The escalation began with judicially condemned unlawful institutional conduct directed at the operating commercial components of the Enterprise. Beginning prior to May 8, 2025, the directive of the Association on which Defendant served had installed a peaje (toll-booth-style obstruction) at the entrance to the residential Jamaca de Dios complex and had cut off potable water service to the company controlled by the operator of the Jamaca de Dios restaurant, PAVIP Productos Alimentos Vip, S.R.L. On May 8, 2025, the Juzgado de Primera Instancia of the Distrito Judicial de Jarabacoa adjudicated Sentencia civil número 1871-2025-SCIV-00083 (Expediente número 2025-0092942), expressly finding the Association directive's conduct "abusiva, arbitraria, unilateral, y clandestina" (abusive, arbitrary, unilateral, and clandestine) and adjudicating three independent constitutional violations: (i) violation of the right to free transit under Article 46 of the Dominican Constitution, on the ground that conditioning passage to private property upon payment of a peaje deprives property owners of the right to transit, enter, and exit their own property freely; (ii) violation of the constitutional freedom of enterprise (libertad de empresa) under Article 50 of the Dominican Constitution, on the ground that the peaje restricted the lawful business operations of the registered commercial enterprise PAVIP Productos Alimentos Vip, S.R.L., including by restricting access for its employees and customers; and (iii) the unlawful interruption of potable water service to PAVIP. The Sentencia ordered immediate removal of the peaje at residential Jamaca de Dios, ordered immediate restoration of potable water service to PAVIP, imposed a daily astreinte of RD$5,000 for non-compliance, and rendered the judgment executory notwithstanding any appeal. Defendant did not appeal the Sentencia. On May 15, 2025, on United States soil at the Banreservas trade show in Washington Heights, New York, Defendant

15

announced to Plaintiff Ballantine that he would not appeal, that he would destroy the operator of the Jamaca de Dios restaurant, and that he would deploy one Dominican government agency after another against the Enterprise. On May 18, 2025 — three days after Defendant's announcement on United States soil and ten days after the Juzgado de Primera Instancia had adjudicated three constitutional violations against the Association directive's conduct and condemned that conduct as abusive, arbitrary, unilateral, and clandestine — the publication campaign was activated and disseminated within seventy-two hours into approximately thirty Spanish-language news outlets and through social media accounts with a combined follower base exceeding 8.5 million. The escalation pattern — from a peaje and water cutoff judicially adjudicated as triple constitutional violations on May 8, to announced destruction of the restaurant operator on U.S. soil on May 15, to a coordinated development-wide publication campaign on May 18 — was direct, sequential, and uninterrupted.

37)     In the days immediately preceding May 18, 2025, Defendant transmitted denuncias and petitions to senior officials of the Dominican government and to multiple Dominican government institutions, ultimately reaching approximately eight institutions: the President of the Dominican Republic, the Ministry of Public Works, the Ministry of the Presidency, the Colegio Dominicano de Ingenieros, Arquitectos y Agrimensores (CODIA), Salud Pública, the Cuerpo de Bomberos, the Ministry of Environment, and the Ayuntamiento Municipal de Jarabacoa. Multiple of the May 18 publications expressly identified Defendant by name and as a United States citizen acting in representation of the Association, including Acento, El Nuevo Diario, Ensegundos, N Digital, RTVD, and 7días, among others.

38)     The denuncias did not request inspection or review. They demanded closure of the Jamaca de Dios restaurant and demolition of constructions Defendant alleged to be illegal at the

16

Development — specific commercial outcomes against the operating commercial establishment owned by a competitor of Defendant's announced acquisition objective, and against the broader Enterprise. In his communication to the President of the Dominican Republic, Defendant did not request that the head of state direct an inspection. Defendant directed the head of state to order demolition. Six days later, on May 24, 2025, while institutional inspections were ongoing on the Development, Defendant repeated the same demand directly to Plaintiff Ballantine in writing: "Knock it down and rebuild something beautiful." The same May 24 communication described, in Defendant's own words, the commercial-acquisition structure by which Defendant proposed to take over the targeted operation, as set forth in detail at ¶44 below. The substantive identity between the demand Defendant made of the head of state of the Dominican Republic and the demand Defendant made of Plaintiff Ballantine in the context of an acquisition discussion six days later is direct evidence that Defendant's communications to the Dominican government were directed not at obtaining genuine government redress of a safety concern, but at causing government action that would depress the valuation of, and ultimately remove, the commercial operation Defendant intended to acquire.

39)     The May 18 publications appeared in two distinct distribution patterns: a longer-form version reproducing direct quotations attributed to Defendant and the four-institution verification claim described below, and a shorter-form summary version. The two distinct patterns support the inference of coordinated press-packet distribution rather than independent reporting. The publications attacked the Jamaca de Dios Development on a development-wide basis, not the restaurant component alone. The publications alleged "el inminente riesgo de colapso de la montaña" (the imminent risk of collapse of the mountain); that "la cordillera podría colapsar" (the mountain ridge could collapse), causing more deaths than the Jet Set nightclub disaster; that the

17

Ministry of Environment should "tome el control de toda la montaña" (take control of the entire mountain); that demolition was demanded for "las edificaciones que no cuentan con permisos" (the buildings, plural, that lack permits); and that the buildings "representan un peligro para quienes la habiten" (represent a danger to those who inhabit them). The publications further described "la fragilidad de los terrenos del sector Jamaca de Dios" (the fragility of the Jamaca de Dios sector terrain) and "otras obras en construcción en la montaña" (other works under construction on the mountain). The substantive consequences of the publications were directed at every home, every structure, and every prospective construction at the Development.

40)     The May 18 publications were not directed at any single component of the Enterprise. They were a development-wide attack on the Jamaca de Dios Development, on the Mark, and on Plaintiff Ballantine personally as developer and Mark owner. The publications alleged "el inminente riesgo de colapso de una montaña" (the imminent risk of collapse of a mountain) in the Jamaca de Dios sector of Palo Blanco, Jarabacoa; that "la cordillera podría colapsar" (the mountain ridge could collapse), causing more deaths than the Jet Set nightclub disaster six weeks earlier; that the Ministry of Environment should "tome el control de toda la montaña" (take control of the entire mountain); and that "la fragilidad de los terrenos del sector Jamaca de Dios" (the fragility of the Jamaca de Dios sector terrain) made every structure on the mountainside unsafe. The publications further alleged that landslides and ground displacements ("deslizamientos" and "aludes") occurred continuously in the Jamaca de Dios sector and that the conditions on the mountain were "really worrying." The Jet Set nightclub disaster of April 8, 2025, in which 236 Dominicans had died six weeks earlier, was the most deadly civil-structural collapse in recent Dominican memory and was widely known and felt within the Diaspora Market. The cumulative effect of these statements was to characterize the entire mountainside on which the

18

Development sits — the mountain Plaintiff Ballantine had spent more than twenty-one years stewarding under approved Ministry of Environment and Ministry of Tourism plans — as imminently catastrophic and as requiring direct seizure by the Dominican government.

41) The publications expressly extended the alleged danger beyond any single structure to "otras obras en construcción en la montaña" (other works under construction on the mountain) within the Jamaca de Dios sector — active construction projects of Plaintiff Ballantine's Enterprise. The publications demanded that "todas las obras" (all works) at the Development be stopped immediately and investigated, framed as necessary to "proteger la vida humana y la estabilidad ecológica" (protect human life and ecological stability). The publications demanded provisional or definitive closure of components of the Enterprise and demolition of "las edificaciones que no cuentan con permisos" (the buildings, plural, that lack permits) and of "construcciones ilegales en Jamaca de Dios" (illegal constructions at Jamaca de Dios). The publications further described those buildings as representing "un peligro para quienes la habiten" (a danger to those who inhabit them) and as "construcciones que pueden colapsar en cualquier momento" (constructions that could collapse at any moment). The framing was a development-wide attack on the safety, permitting, legality, and continued operation of every constructed and prospective component of the Enterprise.

42) The publications attacked Plaintiff Ballantine's direct interests in the mountain, the springs, and the lot architecture of the Development. The publications attributed to unnamed experts of the Ministry of Environment the opinion that "se sustenta prácticamente toda la montaña de este proyecto" (practically the entire mountain of this project rests on the lot 35 area). No such expert opinion existed. The publications represented to the Diaspora Market and to Dominican government institutions that Plaintiff Ballantine's twenty-one-year mountainside Development

19

structurally rested on a single allegedly destabilized parcel — a fabricated institutional-expert claim deployed to characterize the entire Development as imminently dangerous. The publications alleged that approximately 14,000 square meters of land had been cleared on lot 35, directly below the restaurant, destabilizing the mountain on which the Development rests. No such clearing occurred; lot 35 was never touched. The publications further alleged that the Enterprise was "atacando varios nacimientos de agua" (attacking several water springs) and that the Ministry of Environment should intervene to stop "ataques a la montaña y a los manantiales" (attacks against the mountain and against the springs) — falsely accusing Plaintiff Ballantine, who has stewarded the Development's natural water resources for more than twenty-one years under the Baiguate management plan approved by the Ministry of Environment, of ongoing destructive harm to those very resources. The publications described residents and neighbors located below and adjacent to the affected lots as in present danger. Each of these statements was false.

43)  The publications attacked the Mark and Plaintiff Ballantine personally by name. The publications stated, and the headlines amplified, that Jamaca de Dios was unstable on a development-wide basis — publishing under headlines including "Se tambalea la Jamaca de Dios" (Jamaca de Dios is shaking), "temen derrumbe montaña" (they fear collapse of the mountain), "Alertan sobre posible colapso en Jamaca de Dios" (warning of possible collapse at Jamaca de Dios), and "construcciones ilegales en Jamaca de Dios" (illegal constructions at Jamaca de Dios). The publications further stated that Plaintiff Ballantine had sold the entire Jamaca de Dios project; that Plaintiff Ballantine "legally lacks purpose" as developer of the Enterprise; that Plaintiff Ballantine "lacked the quality" to continue developing the project he had founded, named, registered, and built; and that Plaintiff Ballantine had been converted into one more property owner rather than a developer. Each of those statements was false. The publications represented that the

20

Association — a nonprofit residents' association with no developer authority and no permit-review or title-review authority of any kind — held authority to oppose construction across the Development. The cumulative effect within the Diaspora Market was the conversion of the Mark's twenty-one-year identity — from premium mountain destination to imminent mountain catastrophe — and the conversion of Plaintiff Ballantine's personal commercial reputation — from the publicly identified twenty-one-year developer of the Enterprise to a person allegedly stripped of lawful authority to continue the project bearing his Mark.

44)     The Jamaca de Dios restaurant component, as the public-face commercial venue of the Enterprise, served as the most visible commercial trigger of the campaign. The publications quoted Defendant as stating, in substance, that the restaurant could "desplomarse en cualquier momento" (collapse at any moment); that it was originally built as a sales office and not as a restaurant; that it was built to receive no more than one hundred people but currently receives more than eight hundred; that balconies at the restaurant were constructed without columns, supports, walls, rebar, or beams; that the construction lacked permits from the Association, the Municipality of Jarabacoa, CODIA, and Obras Públicas; and that a tragedy comparable to the Jet Set nightclub collapse was to be avoided. Each of these statements about the restaurant was false. The restaurant's actual licensed capacity, structural design, and permitting history do not correspond to the figures and characterizations Defendant disseminated; the one-hundred-versus-eight-hundred capacity allegation in particular was a fabricated quantitative claim designed to invoke the Jet Set tragedy comparison and to convert the restaurant component into a public-safety emergency in the eyes of Dominican government institutions and the Diaspora Market.  The restaurant was open and operating normally with customers present on May 18, 2025.  Despite several expansions over time, the restaurant had never had more than approximately 225 people

present at any one time. The restaurant was designed and constructed as a restaurant by Plaintiff Ballantine and the operator, was permitted as a restaurant from inception, and has operated continuously as a restaurant for approximately eighteen (18) years prior to May 18, 2025. At no time during that eighteen-year period did Defendant or any other person represent to the operator or to Plaintiff Ballantine that the restaurant was structurally unsafe, lacked permits, or required closure. The publications demanded provisional or definitive closure of the restaurant and represented that four named Dominican institutions — the Ministry of Public Works (Obras Públicas), the Colegio Dominicano de Ingenieros, Arquitectos y Agrimensores (CODIA), Salud Pública, and the Cuerpo de Bomberos — had "verified in situ the veracity" of Defendant's allegations. No such verification by any of those institutions had occurred. The photographs had originally been taken by Jonathan Gutierrez during construction, were transmitted by Gutierrez to the restaurant operator in or about 2021, and remained in Gutierrez' possession. Mr. Gutierrez left the restaurant's employment several years before May 2025 and thereafter became Defendant's caretaker on properties adjacent to the restaurant. Defendant caused those photographs to be selected, retrieved, and presented as current visual evidence of conditions that did not exist. The publications identified Defendant by name and institutional capacity as the voice of the Association and as a United States citizen, while failing to identify Plaintiff Ballantine as the Mark owner and authorized developer. The Jamaca de Dios restaurant was the immediate commercial target of the campaign; the restaurant operator's independent injuries are reserved to the restaurant operator. Plaintiff Ballantine's claims arise from the development-wide attack on the Mark, the Development, the Enterprise, and Plaintiff Ballantine's personal commercial reputation as developer.

45)     The operator of the Jamaca de Dios restaurant has personal knowledge that none of the four named institutions—the Ministry of Public Works (Obras Publicas), the Colegio Dominicano de Ingenieros, Arquitectos y Agrimensores (CODIA), Salud Publica, and the Cuerpo de Bomberos—had contacted the restaurant or any of its personnel before May 18, 2025.  The Chief of the Jarabacoa Fire Department has independently confirmed that the Cuerpo de Bomberos was not contacted before May 18, 2025, and that the Cuerpo de Bomberos inspected the restaurant only after the publication campaign launched, finding no danger to the building and no public-safety concern.  The representation that the four named institutions had "verified in situ the veracity" of Defendant's allegations represented a past, competed governmental act..

46)     Following the May 18, 2025 publications, Defendant continued to occupy and use his own residential properties within the Jamaca de Dios development on the same mountainside the publications represented to be at imminent risk of structural collapse.  Defendant did not evacuate the properties, did not warn guests or visitors, did not relocate his family or staff, did not cease use of the properties, and did not take any other action consistent with a genuine belief in the imminent-collapse and Jet Set-comparison claims his publications had disseminated to the Diaspora Market.

**G. The Spanish-Language Media Ecosystem and the United States Diaspora Audience**

47)     The May 18, 2025 publications were disseminated by, among other outlets, El Nuevo Diario, N Digital, Acento, El Día, 7días, El Nuevo Diario RD, El Pregonero, VisiónRDN, La Nación Dominicana, El Avance Media, Roberto Cavada (RC Noticias), Nuria Piera, Noticias SIN, Telesistema 11 (Telenoticias), De Último Minuto, Hechos, HT Noticias, Acento TV, Teleuniversotv, El Nuevo Diario TV, and Controlandoelejido, among others. Across the social media accounts of these outlets on Facebook, Instagram, and Twitter/X, the publications appeared

on accounts with a combined follower base exceeding 8.5 million followers, including individual accounts with followings exceeding one million.

48)    The Spanish-language media ecosystem through which Defendant disseminated the May 18, 2025 publications operates as a structurally integrated transnational system serving the Dominican Republic and the United States diaspora community of persons of Dominican descent. Among the outlets that disseminated the May 18, 2025 publications, controlandoelejido.com occupies a particular position as a Spanish-language digital media outlet headquartered in the Bronx, New York. Controlandoelejido self-identifies on its masthead as "Tu portal digital dominicano en New York" (Your Dominican digital portal in New York), displays a Statue of Liberty banner, and operates a live Bronx-time clock on its publication pages. The outlet is directed at and serves Dominican-American residents of Washington Heights, the Bronx, and the greater New York metropolitan area. On May 18, 2025, controlandoelejido.com published the campaign under the headline "Alertan sobre posible colapso en Jamaca de Dios" (Warning of possible collapse at Jamaca de Dios) sourced to the Association of Owners of Jamaca de Dios. Defendant's use of the Mark and false institutional indicia thus occurred not merely with reach into the United States from abroad, but through publication and dissemination within the United States, in New York, into Plaintiff Ballantine's established New York-based diaspora purchaser and investor community.

49)    The Diaspora Market is large, concentrated, and formally recognized by United States legislative bodies and officials. The New York State Assembly, in Concurrent Resolution K48 (adopted February 26, 2025), formally found that there are over two million persons of Dominican descent in the United States and over one million in the State of New York; that Dominicans are the largest immigrant group in New York City and represent approximately thirty

percent of the entire Latino population of New York City; and that Dominicans represent the largest group of naturalized citizens of all immigrant populations in New York City. Three of the outlets that disseminated the May 18, 2025 publications — El Nuevo Diario (Persio Maldonado, director and President of the Sociedad Dominicana de Diarios), N Digital and N Investiga (Nuria Piera, director), and Noticias SIN (Alicia Ortega, director) — were formally recognized by New York State Senator Luis R. Sepúlveda, whose district includes Bronx communities at the center of the Dominican-American diaspora, on or about March 31, 2025, in his official capacity as a New York State legislator and acting in honor of the New York State Assembly's designation of February 2025 as Dominican Heritage Month. Senator Sepúlveda's stated reason for the recognition included the recipients' role "not only for the Dominican Republic, but also for the diaspora and the entire Latino community." The importance of Spanish-language media to the United States Dominican-American audience is further reflected by the public record on Televisión Dominicana, the leading Dominican-content cable network in the United States, which reached approximately 3.4 million subscribers across the United States, including approximately 750,000 in New York City alone, per the network's corporate parent Hemisphere Media Group. The New York City Public Advocate, in formal correspondence to AT&T Entertainment Group dated August 23, 2017, characterized Televisión Dominicana as "an invaluable resource for the millions of Dominican Americans living in this city and country" and as serving "a distinctive and vital role for immigrant families to acclimate and to maintain connections to the Dominican Republic." United States Representative Adriano Espaillat (D-NY-13), in his own June 2017 letter, formally identified Spanish-language media as "one of our main communication platforms" for the Dominican-American community. The publications continue to circulate within that market and remain accessible to readers in the United States as of the date of this filing.

25

**H. Post-Campaign Confirmations and Continuing Conduct**

50) On May 19, 2025, the day after the publications, the entire nine-member City Council of Jarabacoa convened an emergency meeting for the sole purpose of inspecting the Jamaca de Dios complex. The Council found no violations. The conditions found at the Development on inspection did not match the conditions depicted in the photographs accompanying the May 18 publications, which depicted construction-period conditions from prior development periods.

51) Following the May 18, 2025 publication campaign, eight Dominican government agencies separately inspected and reviewed the allegations contained in the publications. None of the eight agencies confirmed any of Defendant's claims. The documented findings include: a written report from the Ministerio de Vivienda, Edificaciones y Asentamientos (MIVED) based on two technical inspections conducted by MIVED engineers Giordano García and Fanny Valerio on May 19 and June 4, 2025, concluding in the publicly disseminated MIVED report that "no existe ningún tipo de riesgo estructural ni peligro de colapso en las instalaciones, ni en el terreno circundante" (no structural risk or danger of collapse exists in the installations, nor in the surrounding terrain), and further finding that "el terreno no presenta signos de erosión, agrietamientos, desplazamientos, socavaciones ni asentamientos diferenciales" (the terrain shows no signs of erosion, cracking, displacement, undermining, or differential settlement) and that "la estructura general del edificio no muestra patologías estructurales aparentes tales como grietas, deformaciones, inclinaciones o daños materiales en columnas, muros, pisos o elementos de soporte" (the general structure of the building shows no apparent structural pathologies such as cracks, deformations, inclinations, or material damage in columns, walls, floors, or supporting elements); a publicly documented Ministerio de Turismo inspection finding no violations; a Ministerio de Medio Ambiente site inspection — by the very ministry whose intervention the

publications had demanded — finding no supporting concerns; the unanimous rejection of the allegations by the nine-member Ayuntamiento Municipal de Jarabacoa; and renewal of the property's insurance coverage by Banco de Reservas, the state-owned bank of the Dominican Republic that underwrites the structural insurance policy on the restaurant, following its own independent inspection. The MIVED institutional refutation was published on or about June 12, 2025 within the same Spanish-language media ecosystem that had disseminated the May 18 publications, and was thereby accessible to the same Diaspora Market that the May 18 publications had reached. Notwithstanding the institutional refutation in the same media ecosystem, Defendant has not retracted, corrected, or withdrawn any publication.

52) Immediately following the May 18 publications, customers contacted the Jamaca de Dios restaurant and its personnel asking whether the restaurant was safe, whether it was closing, whether Jamaca de Dios was dangerous, or whether they should avoid visiting; many believed the restaurant had been formally condemned or shut down by the Dominican government. Approximately thirty percent of the restaurant's 2025 reservation records carried New York or New Jersey area codes, reflecting a substantial New York metropolitan customer base within the same Diaspora Market that Defendant's campaign was directed toward.

53) In the immediate aftermath of the May 18, 2025 publication campaign, a then-current member of the directive of the Asociación de Propietarios Residencial Jamaca de Dios contacted Plaintiff Ballantine at his Florida residence by telephone. The board member told Plaintiff Ballantine that he had seen the news of the publication campaign and was reaching out to propose a path forward. The board member told Plaintiff Ballantine that he had himself quit the directive of the Association and was reaching out in that capacity. The board member's stated proposal was a peace arrangement under which the operator of the Jamaca de Dios restaurant

would be elevated to vice president of the Association alongside Defendant as president, framed as a settlement of the conflict. The board member addressed Plaintiff Ballantine as the developer of the Enterprise. Plaintiff Ballantine asked the board member to provide his resignation letter as documentation of what the board member had represented. The board member never provided the requested resignation letter. The proposed arrangement subsequently materialized in substantially the same form on July 5, 2025, when Defendant convoked the sparsely attended extraordinary general assembly pleaded below, at which the operator of the Jamaca de Dios restaurant was elected vice president on the same ticket — an institutional mechanism Defendant thereafter ignored, with no board meeting ever held.

54)    Six days after the May 18, 2025 publication campaign launched, Defendant confirmed to Plaintiff Ballantine in direct written communication his commercial intent and acquisition structure for the Jamaca de Dios restaurant component that the campaign had targeted. Defendant told Plaintiff Ballantine, with reference to the restaurant, "Knock it down and rebuild something beautiful." Defendant told Plaintiff Ballantine, "If the restaurant can be bought as a 'house' not a business then there is promise." Defendant described the ownership structure by which he proposed to effect the acquisition: "Have those — back end management agreement holding ownership" and "Front guy has minor ownership and little voting rights." In the same exchange, Plaintiff Ballantine informed Defendant in writing of the specific contractual relationship between Plaintiff Ballantine and the operator of the Jamaca de Dios restaurant, including that the Mountain Lodge construction would trigger a one-hundred-fifty-thousand-dollar ($150,000) milestone payment to Plaintiff Ballantine under that contract, and that the contract had been negotiated with the Association's involvement. The communication was sent through a channel that Defendant continued to use in the same exchange thereafter. When Plaintiff Ballantine

described the Mountain Lodge expansion as a contemplated component, Defendant responded with reference to the operator of the Jamaca de Dios restaurant: "You will make him stronger, and a bigger enemy."

55) After causing publication of the May 18, 2025 campaign alleging imminent structural collapse of the mountainside on which the Jamaca de Dios development sits, Defendant — who is domiciled in Rye, New York — continued to occupy his villas at Jamaca de Dios when present at the development. Defendant did not evacuate. Defendant did not warn his guests. Defendant did not commission any independent engineering assessment of the structures or terrain his publications had declared imminently dangerous.

56) On July 5, 2025, Defendant convoked a sparsely attended extraordinary general assembly of the Association and ran unopposed for president, with the operator of the Jamaca de Dios restaurant democratically elected as vice president on the same ticket, in an arrangement presented as a peace settlement. Defendant arrived at the assembly accompanied by five armed bodyguards, observed directly by Plaintiff Ballantine, who attended the meeting. The July 5 assembly was a purported institutional ratification, undertaken in apparent recognition of the unauthorized character of the conduct that had preceded it. Following the assembly, every attempt by the duly elected vice president to perform that role was ignored by Defendant, and no board meeting was ever held.

57) On December 8, 2025, Defendant transmitted a second formal letter from his New York domicile to local municipal authorities, issued under the Association identity Defendant controlled from his Rye, New York domicile, bearing the JAMACA DE DIOS name and logo and the Association's institutional stamp without any individual human signature, and carrying a commercial registration stamp giving the appearance of an officially registered commercial entity

29

— fifteen months after the underlying registration had expired and could not be recovered. The letter repeated and amplified the April 4 falsehoods, asserting again that Plaintiff Ballantine had sold the entire project, that Plaintiff Ballantine "legally lacks purpose," and that the Association had standing to oppose developer plan approvals. The December 8 letter was transmitted more than six months after the May 24, 2025 written communication in which Plaintiff Ballantine had informed Defendant of the $150,000 Mountain Lodge milestone payment owed to Plaintiff Ballantine under the contract with the restaurant operator. The December 8 letter formally opposed the very Mountain Lodge construction that, if completed, would trigger the milestone payment to Plaintiff Ballantine. The December 8 letter further cited Plaintiff Ballantine's own covenants and restrictions for the Jamaca de Dios complex — governance instruments Plaintiff Ballantine drafted and that bind property owners through their purchase contracts with Plaintiff Ballantine — as if those covenants belonged to and were enforced by the Association. The Association never adopted those covenants. Defendant's use of Plaintiff Ballantine's own governance instruments against Plaintiff Ballantine in a market-facing institutional communication mirrors the unauthorized invocation of Mark, letterhead, stamp, and registration number alleged elsewhere in this Complaint.

58)    On December 13, 2025, at the regular Association election, Defendant ran unopposed and was elected to the standard two-year term. Defendant proposed a bylaws amendment to extend the presidential term from two years to four years; the membership rejected the proposed amendment, and Defendant acquiesced to the standard two-year term.

59)    On February 28, 2026 — during the pendency of this action and eight months after the institutional inspections had concluded that the publications' claims were unfounded — Defendant, acting in his purported capacity as President of the Association, hosted an event in the

common areas of the Jamaca de Dios development. The event included a temporary stage, temporary lighting, a live band, food, and drinks, and was attended by Dominican government functionaries and political figures. The common areas where the event was held are constructed and titled in the name of Plaintiff Ballantine's company, Jamaca de Dios. The location of the event was directly below the area of the mountainside that Defendant's May 18, 2025 publications had alleged was imminently collapsing.

60)   On March 3, 2026, an invoice in the amount of RD$4,774,050 (approximately US$80,000) was issued on Association letterhead bearing the JAMACA DE DIOS name and logo and the Association's institutional stamp, transmitted to the operator of the Jamaca de Dios restaurant, signed by Milly Gonzalez of the Association's administrative department. The amounts demanded are fabricated; no underlying debt corresponding to the amounts exists.

## I. Disruption of the Mountain Lodge Component

61)   The Mountain Lodge expansion holds the Ministry of Environment and Ministry of Tourism approvals it requires to proceed under the Baiguate management plan. The remaining administrative steps for the Mountain Lodge structure consist of routine clerical processing by the Municipality of Jarabacoa — the same routine clerical processing the Municipality has performed without incident for every villa constructed within the Jamaca de Dios complex over the prior twenty years.

62)   Plaintiff Ballantine has known the Mayor of Jarabacoa for over twenty years and the President of the City Council of Jarabacoa for over fifteen years through Plaintiff Ballantine's continuous development and administration of the Jamaca de Dios complex within the Municipality. Prior to Defendant's April 4, 2025 letter, the President of the City Council met in person with Plaintiff Ballantine and Plaintiff Ballantine's Dominican counsel and stated that he

31

was confused as to the relationship among three entities: the Association of Property Owners; Plaintiff Ballantine in his capacity as exclusive developer of the Enterprise; and the Jamaca de Dios restaurant. Following Defendant's April 4, 2025 letter, the Municipality's processing of Plaintiff Ballantine's routine lot-layout and subdivision-record submission was paused. Following Defendant's December 8, 2025 letter, the Municipality's processing of the routine clerical construction-tax payment owed on the Mountain Lodge structure — a non-discretionary ministerial act the Municipality had performed without incident for two decades — was likewise paused. The disruption pattern began only after Defendant's unauthorized institutional communications and tracks each communication in time. As of the date of this filing, the Mountain Lodge ministerial processing remains administratively silent.

63)     The disruption blocked the contingent payment of $150,000 owed to Plaintiff Ballantine in cash by the company controlled by the operator of the Jamaca de Dios restaurant upon completion of the Mountain Lodge structure, contractually triggered by Mountain Lodge completion. The disruption also stalled the builder profit Plaintiff Ballantine would have earned as developer and builder of the Mountain Lodge structure within the settled Development, and stranded substantial development and execution-preparation costs Plaintiff Ballantine had incurred over more than a decade of planning, design, engineering, and concept development for the Mountain Lodge. The disruption further impaired Plaintiff Ballantine's enterprise-value position with respect to the second phase of the Development that the 2015 Administration Agreement expressly recognizes as Plaintiff Ballantine's exclusive ownership.

**J. Direct Personal Injury to Plaintiff Ballantine and Disruption of Commercial Relationships**

64)     For more than twenty-one years, Plaintiff Ballantine has marketed the Mark and the Enterprise to the Diaspora Market as a premium mountain residential and hospitality destination. The Mark's commercial value in that audience rests on the association of the brand with mountain safety, exclusivity, and premium development. The May 18, 2025 publications inverted each of those associations: they alleged that the mountain itself was collapsing, that the entire ridge was in imminent danger, that the terrain was fragile and continuously failing, that the Development's structures required demolition, that the Ministry of Environment should take control of the entire mountain, and that a catastrophic event greater than the Jet Set tragedy six weeks earlier was imminent. The commercial effect within Plaintiff Ballantine's established U.S.-linked market was the conversion of the Mark's twenty-one-year identity, from premium mountain destination to imminent mountain catastrophe.

65)     The publications and Defendant's continuing unauthorized institutional communications produced commercial injury to Plaintiff Ballantine personally and to the personal capital assets Plaintiff Ballantine holds as the founder, developer, administrator, and Mark owner of the Enterprise. The Mark's value was diminished. The Mark's accumulated goodwill within the Diaspora Market was impaired. Plaintiff Ballantine's exclusive right to control the Mark in U.S.-linked commerce was invaded. Plaintiff Ballantine's personal commercial reputation as the publicly identified twenty-one-year exclusive developer and administrator of the Enterprise was impaired. The publications carried the implication that homes within the Development were unsafe and could be subject to demolition demands, suppressing prospective commercial activity at the Development on a development-wide basis.

66)     The campaign caused immediate, documented commercial disruption within the Diaspora Market. In the days immediately preceding May 18, 2025, a repeat New York-based

purchaser who had previously acquired a villa within the Development was actively engaged with Plaintiff Ballantine regarding an additional acquisition, including offer, counter-offer, and financing terms. In the immediate aftermath of the May 18 campaign, that active relationship collapsed.

67)    The specific losses include the withdrawal of Plaintiff Ballantine's United States-based co-titleholder Mr. Ed Klein — a successful and lifelong commercial and residential real estate investor who holds title to the Mountain Lodge property in his own name and who had been in active discussions with Plaintiff Ballantine regarding the form and structure of his investment and participation in the Mountain Lodge development — from the Mountain Lodge development opportunity. Mr. Klein withdrew after observing the May 18, 2025 coordinated publication campaign and its market impact.

68)    The specific losses also include the foreclosure of the SmartWell Health wellness collaboration with Mr. Karim Delgado. Mr. Delgado is a United States citizen and the founder of SmartWell Health. Mr. Delgado moved to the Dominican Republic solely to work with Plaintiff Ballantine on the development of a wellness center at Jamaca de Dios that he would lead, intended to develop international medical tourism in the mountains. For an extended period prior to the May 18, 2025 campaign, Mr. Delgado resided at and operated from Jamaca de Dios while developing that wellness concept in collaboration with Plaintiff Ballantine. Plaintiff Ballantine paid Mr. Delgado for work performed in connection with that collaboration. Mr. Delgado provided wellness treatment services to clients at the property, including to Defendant himself on multiple occasions. Following Defendant's May 18, 2025 publication campaign, Mr. Delgado withdrew from the SmartWell Health wellness collaboration and the campaign permanently foreclosed his intended return to Jamaca de Dios. Mr. Delgado is expected to testify as a third-party fact witness.

69) The operator of the Jamaca de Dios restaurant is expected to testify as a third-party fact witness corroborating the scale, reach, and willfulness of Defendant's campaign. Among the facts to be corroborated: approximately thirty percent of the restaurant's 2025 reservation entries carried New York or New Jersey area codes, consistent with a substantial New York–New Jersey customer base; and following the May 18, 2025 campaign, the company controlled by the restaurant operator reduced its workforce by approximately thirty percent, documented in contemporaneous payroll records.

## K. Coordination, Agency, and Willfulness

70) Defendant did not act only through private personal speech. The May 2025 campaign was a coordinated, market-facing dissemination of false statements concerning the safety, legality, quality, developer authority, and commercial viability of Jamaca de Dios and its related goods, services, and commercial activities. Defendant used the Association's name, letterhead, stamp, registration number, institutional title, intermediaries, source materials, photographs, media channels, municipal communications, and persons acting in concert with or at the direction of Defendant to give the campaign institutional weight and to cause the challenged statements to reach the United States-linked purchaser and investor market alleged herein. Defendant's invocation of the April 8, 2025 Jet Set disaster does not, on the facts alleged, remove the campaign from its commercial context.

71) These allegations are not pleaded as a standalone civil-conspiracy claim. They are pleaded to show Defendant's knowledge, willfulness, malice, improper means, agency, coordination, and participation in the underlying Lanham Act and related tort violations. Discovery will determine the full scope of communications, authority, roles, knowledge, and participation among the persons known and unknown who assisted, transmitted, published, supplied source

35

material for, authorized, ratified, relied upon, or acted upon Defendant's challenged communications. Discovery will also reveal the full extent to which Defendant held himself out as authorized to speak for or act on behalf of Jamaca de Dios.

**L. Known Participants, Recipients, and Material Fact Witnesses**

72)    The following persons are identified because they are believed to have knowledge concerning the authorship, authorization, dissemination, receipt, reliance upon, or consequences of Defendant's challenged communications. These allegations are pleaded to identify known sources of relevant evidence, preserve the factual basis for discovery, and support coordination, agency, knowledge, willfulness, reliance, and causation. They are not pleaded as claims against these persons.

73)    The following persons are identified as material fact witnesses to facts relevant to the matters alleged herein:

• Mr. José Lixander Mendoza Garzón — owner and operator of the Jamaca de Dios restaurant. Material fact witness regarding the campaign's scale, reach, and willfulness; the May 24, 2025 written communications regarding the $150,000 Mountain Lodge milestone; the post-campaign workforce reductions; and the contractual relationship between Plaintiff Ballantine and the restaurant operator.

• Mr. Karim Delgado — United States citizen, founder of SmartWell Health. Material fact witness regarding the wellness center collaboration, the international medical tourism concept, payments received from Plaintiff Ballantine for work performed, treatment services provided to Defendant on multiple occasions, and the impact of the May 18, 2025 publication campaign on the SmartWell Health collaboration.

• Mr. Ed Klein — United States investor and co-titleholder of the Mountain Lodge property. Material fact witness regarding the active Mountain Lodge investment discussions with Plaintiff Ballantine prior to May 18, 2025 and his withdrawal from the Mountain Lodge development opportunity following observation of the May 18, 2025 publication campaign.

36

74)	The following persons are identified as persons with knowledge of facts relevant to the matters alleged herein:

• Mr. Iván Amiro Noboa Díaz — served as president of the Asociación de Propietarios Residencial Jamaca de Dios until his hasty resignation on or about March 17, 2025, citing personal reasons. Identified as a person with knowledge of facts relevant to the matters alleged herein, including Association governance preceding the resignation, the circumstances of the resignation, and his short-term plans immediately following the resignation.

• Mr. Williams Jiménez — previously served as a member of the directive of the Asociación de Propietarios Residencial Jamaca de Dios. Identified as a person with knowledge of facts relevant to the matters alleged herein.

• Mr. Ricardo Cucurullo — previously served as a member of the directive of the Asociación de Propietarios Residencial Jamaca de Dios. Identified as a person with knowledge of facts relevant to the matters alleged herein.

• Mr. Joselito Abreu — Mayor of Jarabacoa, Dominican Republic. Identified as a person with knowledge of facts relevant to the matters alleged herein, including the Municipality's processing of the Mountain Lodge component.

• Mr. Roberto Ureña — President of the City Council of Jarabacoa, Dominican Republic. Identified as a person with knowledge of facts relevant to the matters alleged herein, including the Municipality's processing of the Mountain Lodge component and the institutional confusion described above.

• Mr. Jonathan Matías Gutierrez — previously employed within the operation of the Jamaca de Dios restaurant; currently in the employ of Defendant. Identified as a person with knowledge of facts relevant to the matters alleged herein, including the provenance of photographs incorporated into the May 18, 2025 publications.

• Ms. Danilza Sánchez — previously served as administrator of the Asociación de Propietarios Residencial Jamaca de Dios. Identified as a person with knowledge of facts relevant to the matters alleged herein.

37

• Ms. Milly González — current administrator of the Asociación de Propietarios Residencial Jamaca de Dios. Identified as a person with knowledge of facts relevant to the matters alleged herein, including the March 3, 2026 invoice and Association communications during the period of Defendant's purported presidency.

## COUNT I

### False Advertising under 15 U.S.C. § 1125(a)(1)(B)

75) Plaintiff Ballantine repeats and realleges each and every allegation set forth in the Common Factual Allegations above as if fully set forth herein.

76) This Count is brought under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), which prohibits false or misleading commercial statements made in connection with the commercial activities of the speaker that are likely to cause commercial injury to another.

77) Defendant, acting personally and directly and/or indirectly through others that he caused to act, made and caused the publication of statements of fact that were false and/or misleading. The challenged statements include the assertions, alleged in the Common Factual Allegations above, that the entire Jamaca de Dios mountain ridge was at imminent risk of collapse comparable to the Jet Set nightclub disaster; that buildings (plural) at the Development lacked permits and required demolition; that the Ministry of Environment should take control of the entire mountain; that the buildings represented a danger to those who inhabit them; that the restaurant operator had cleared approximately 14,000 square meters of land on lot 35 destabilizing the mountain; that experts of the Ministry of Environment had opined the entire mountain structurally rested on the lot 35 area; that the Development's construction lacked permits; that the Development was attacking water springs and the surrounding mountain; that Plaintiff Ballantine had sold the entire project, lacked the quality to continue developing it, and had been converted into one more property owner rather than a developer; that the Association held permit-review and

38

title-review authority over the Enterprise; that four named Dominican institutions—the Ministry of Public Works, CODIA, Salud Publica, and the Cuerpo de Bomberos—had "verified in situ the veracity" of Defendant's allegations; and that the visual conditions depicted in photographs accompanying the May 18, 2025 publications represented current conditions at the Development. Each of the foregoing statements was false and/or misleading. Each statement was made and disseminated by Defendant or at Defendant's direction, as alleged in the Common Factual Allegations above. The falsity of the four-institution verification claim is independently corroborated by the restaurant operator's personal knowledge that none of the four-named institutions contacted the restaurant or its personnel before May 18, 2025, and by the Chief of the Jarabacoa Fire Department's confirmation that the Cuerpo de Bomberos was not contacted before publication and inspected only afterward, finding no danger to the building and no public-safety concern.

78) Defendant's challenged statements were commercial advertising or promotion within the meaning of 15 U.S.C. § 1125(a)(1)(B). Defendant is a commercial actor with documented commercial interests in the Enterprise, including residential real estate holdings within the Development, business operations connected to the Enterprise, a documented multi-year acquisition objective toward the restaurant component of the Enterprise, and active commercial competition with the Enterprise through redirection of patronage to a competing developer in the same market. The challenged statements were directed to a specific commercial audience — the diaspora purchaser and investor community of New York residents of Dominican descent that constitutes the established United States-linked market for the Mark and the Enterprise. The challenged statements were disseminated in coordinated form across approximately thirty digital news outlets and through social media accounts with a combined

follower base exceeding 8.5 million people. Defendant's commercial speech was not isolated criticism or private grievance. Defendant engaged in a commercial-acquisition campaign toward components of the Enterprise, with acquisition statements communicated to Plaintiff Ballantine in writing from November 2021 through February 2024 and confirmed in writing on May 24, 2025 — six days after the publication campaign launched against the same restaurant. The challenged statements served that acquisition objective by depressing the commercial valuation of the Enterprise on a development-wide basis, undermining Plaintiff Ballantine's developer authority and the Mark's commercial standing in the relevant market, and disrupting the operational and financial position of the Enterprise.  Plaintiff's Lanham Act claims are not based on any request for governmental redress, but on Defendant's market-facing commercial dissemination of false and misleading statements and Defendant's unauthorized use of the Mark and institutional indicia in commerce to create false affiliation, sponsorship, approval, and authority confusion with the United States-linked Diaspora Market.

79)     The challenged statements are material to purchasing, investment, and lending decisions within the diaspora purchaser and investor community of New York residents of Dominican descent. Statements concerning the structural safety, permitting status, environmental compliance, regulatory legitimacy, and developer authority of a luxury residential and hospitality complex are important considerations to the decisions of purchasers, investors, and lenders considering acquiring, financing, or maintaining commercial relationships with that complex. The challenged statements were calculated to influence those decisions and did influence them.

80)     Defendant's challenged conduct occurred in and affected United States commerce. Defendant is a United States citizen domiciled in Rye, New York, who conceived and directed the May 18, 2025 publication campaign from his United States domicile and through his United States-

40

based commercial and personal operations. Defendant transmitted the April 4, 2025 letter, the December 8, 2025 letter, and the March 3, 2026 invoice from his New York domicile. Three days before the coordinated campaign, Defendant announced the campaign's substance in the United States, at the Feria Inmobiliaria Banreservas New York 2025 commercial real estate investment trade show in Washington Heights, New York, convened for the purpose of reaching the diaspora investor community of New York residents of Dominican descent that Plaintiff Ballantine had served continuously for twenty-one years. The May 18, 2025 publications were further disseminated within the United States by controlandoelejido.com, a Spanish-language digital media outlet headquartered in the Bronx, New York, which self-identifies on its masthead as "Tu portal digital dominicano en New York" and serves Dominican-American residents of Washington Heights, the Bronx, and the greater New York metropolitan area. Controlandoelejido published the campaign on May 18, 2025 under the headline "Alertan sobre posible colapso en Jamaca de Dios" sourced to the Association of Owners of Jamaca de Dios. Defendant's commercial speech was thereby published from New York to the New York-resident Dominican-American diaspora purchaser and investor community — a domestic publication, by a domestic publisher, into a domestic market, of commercial statements directed at goods and services covered by the Mark. The audience reached by Defendant's coordinated dissemination is a recognized United States commercial market, as alleged in detail in the Common Factual Allegations above. The publications continue to circulate within that United States-linked market and remain accessible to readers in the United States as of the date of this filing.

81)    Defendant's false commercial statements proximately caused commercial injury to Plaintiff Ballantine in his business and property, including impairment of the Mark's goodwill in United States commerce, purchaser relationships, and commercial opportunities. Plaintiff

Ballantine has sold at least fifteen properties to purchasers domiciled in the New York metropolitan area and at least fifteen more to purchasers elsewhere in the United States, making the New York-resident Dominican-American purchaser community a recurring and established United States market for the goods and services covered by the Mark. Following the May 18, 2025 campaign, a New York repeat buyer withdrew from a pending transaction; Mr. Klein — a United States investor with whom Plaintiff Ballantine held an active commercial relationship in United States-linked commerce — withdrew from the Mountain Lodge development opportunity; the SmartWell Health wellness collaboration with Mr. Delgado, a United States citizen with whom Plaintiff Ballantine held an integrated commercial relationship in United States-linked commerce, was foreclosed; and the contingent $150,000 Mountain Lodge milestone payment owed to Plaintiff Ballantine was blocked, and remains blocked as of the date of this filing, following Defendant's unauthorized institutional communications. The campaign also disrupted the New York–New Jersey customer base of the Jamaca de Dios restaurant component of the Enterprise: based on contemporaneous reservation records, approximately thirty percent of the restaurant's customer base was associated with phone numbers carrying New York or New Jersey area codes, and, following the campaign, the company controlled by Mr. Mendoza that operates the restaurant reduced its workforce by approximately thirty percent. Customers also contacted the restaurant asking whether it was safe, whether it was closing, whether Jamaca de Dios was dangerous, whether they should avoid visiting, or whether the restaurant had been formally condemned or shut down by Dominican authorities.  These losses constitute commercial injury to Plaintiff Ballantine in United States-linked commerce within the meaning of Section 43(a). Plaintiff Ballantine was injured in his business reputation and in his present and future sales. Plaintiff Ballantine's injuries flowed proximately and directly from Defendant's misconduct.

82)     Defendant's conduct was willful and intended to harm Plaintiff Ballantine. The challenged campaign was pre-announced on United States soil three days before its execution. The campaign included the false attribution of expert opinions to Ministry of Environment personnel that did not exist, the deliberate selection and presentation of construction-period photographs as current visual evidence of conditions Defendant knew did not exist, and the invocation of institutional indicia Defendant knew were not contractually authorized under the 2015 Administration Agreement and were not supported by any active commercial-name registration. Defendant has not retracted, corrected, or withdrawn any of the challenged publications, which remain accessible within the United States-linked market into which they were directed as of the date of this filing. Defendant has continued the unauthorized institutional invocation through the December 8, 2025 letter and the March 3, 2026 invoice, in each case after the eight-agency institutional investigation had failed to confirm any of the publications' claims.  Additional facts support the inference of willfulness and consciousness of falsity; persons acting in coordination with Defendant repeatedly approached the restaurant operator about selling the restaurant to Defendant before the May 18 campaign and never warned the operator of any structural danger, and Defendant continued to occupy and use his own residential properties on the same mountainside after publishing imminent-collapse claims, without evacuating, warning guests, or ceasing use.

83)     This case is exceptional within the meaning of 15 U.S.C. § 1117(a) for the reasons set forth above.

## COUNT II

**False Designation of Origin, Sponsorship, and Affiliation under 15 U.S.C. § 1125(a)(1)(A)**

84) Plaintiff Ballantine repeats and realleges each and every allegation set forth in the Common Factual Allegations above and in Count I above as if fully set forth herein.

85) This Count is brought under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), which prohibits any person from using in commerce, on or in connection with any goods, services, or commercial activities, any word, term, name, symbol, or device, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, that is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. The same facts supporting Count I also violate Section 43(a)(1)(A) of the Lanham Act, because the false and/or misleading statements are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendant with Plaintiff Ballantine, or as to the origin, sponsorship, or approval of Defendant's goods, services, or commercial activities by Plaintiff Ballantine. This Count is anchored on the affiliation, connection, association, sponsorship, and approval branches of Section 43(a)(1)(A), and is not anchored on the origin-of-goods branch.

86) In addition to the false and/or misleading statements supporting Count I, Defendant used in commerce the Jamaca de Dios Mark, the Association's name, logo, letterhead, rubber stamp, and registration number, in coordinated commercial communications including the April 4, 2025 letter, the May 18, 2025 publication campaign disseminated to the diaspora purchaser and investor community of New York residents of Dominican descent, the December 8, 2025 letter, and the March 3, 2026 invoice. Each communication invoked the Mark and the Association's

44

institutional indicia in the projection of commercial authority over the Enterprise. The Mark is registered with the Dominican Republic's ONAPI under Registration No. 185133 and has acquired substantial goodwill and secondary meaning in United States commerce through Plaintiff Ballantine's twenty-one years of continuous marketing, sales, and commercial use within the New York-resident Dominican-American purchaser and investor community. Defendant's use was on and in connection with commercial activities within the meaning of 15 U.S.C. § 1125(a)(1)(A).

87)    Defendant's use of the Mark and of the Association's institutional indicia was unauthorized on four independent grounds, each sufficient standing alone to establish that Defendant's use was unauthorized within the meaning of 15 U.S.C. § 1125(a)(1)(A).

88)    First. The 2015 Administration Agreement contractually limits the Association's authority to common-area maintenance and security and expressly prohibits the Association from participating in any other project or for-profit enterprise. The developer-level functions Defendant's communications projected — including permit-review authority, title-review authority, plan-approval authority, access-control authority, toll-collection authority, and commercial authority over the Enterprise — are reserved exclusively to Plaintiff Ballantine as exclusive developer under Article One of the Agreement. The Agreement has never been amended, modified, or superseded. Defendant's invocation of institutional authority over those functions exceeded the contractual limit on the Association's authority and was unauthorized as a matter of contract.

89)    Second. The Dominican commercial-name registration on which the Association's institutional credential depended expired on March 4, 2024. The six-month grace period for renewal ended on September 4, 2024. The registration was not renewed within that window and could not thereafter be recovered. As of September 5, 2024, no person held any recoverable

registered right in the Association designation. The April 4, 2025 letter, the May 18, 2025 publication campaign, the December 8, 2025 letter, and the March 3, 2026 invoice were each transmitted or disseminated after the registration had lapsed and could not be recovered. Defendant's continuing use of the lapsed designation in commercial and institutional communications was unauthorized as a matter of registered-name law. The April 4, 2025 letter, the May 18, 2025 publication campaign, the December 8, 2025 letter, and the March 3, 2026 invoice were each transmitted or disseminated after the registration had lapsed, and Defendant's continuing use of the lapsed commercial-name designation in commercial and institutional communications was unauthorized.

90)     Third. Plaintiff Ballantine, as the sole owner of the Mark, never authorized Defendant or the Association to use the Mark or the Jamaca de Dios designation for the commercial purposes for which Defendant invoked them. The Mark is held by Plaintiff Ballantine in his personal name as a personal capital asset, not through any corporate entity, and Plaintiff Ballantine alone holds the exclusive right to authorize commercial use of the Mark. Defendant's use of the Mark in commercial and institutional communications projecting authority over the Enterprise was undertaken without authorization from the Mark owner and was unauthorized as a matter of trademark law.

91)     Fourth. The Association's own bylaws and the 2015 Administration Agreement, taken together, did not authorize Defendant's claimed institutional role, did not authorize a single self-appointed officer to bind the Association, and did not authorize the Association to project developer-level, permit-review, title-review, access-control, toll-collection, or commercial authority over the Enterprise. Defendant's April 22, 2025 self-appointment as interim president was not the product of any membership vote, election, or board resolution, and followed no

46

procedure authorized by the Association's bylaws for the appointment of an officer. The communications Defendant transmitted in his claimed institutional capacity — including the December 8, 2025 letter and the March 3, 2026 invoice — issued from a title Defendant had assumed unilaterally and were unauthorized as a matter of internal Association governance.

92)    Defendant's unauthorized seizure of the Association's institutional credential, through his unilateral self-appointment as interim president on April 22, 2025 without any membership vote or board resolution, was the operative mechanism by which Defendant projected institutional authority he did not in fact hold. As a private homeowner, Defendant could not have caused the publications to be disseminated under institutional auspices, could not have transmitted municipal-authority letters on Association letterhead, could not have caused recipients to credit his statements as institutional rather than private speech, and could not have produced the institutional-authority confusion documented above. The Association's credential was the instrument that gave Defendant's false statements institutional weight, gave the publications their attributed authority, and gave the letters their municipal traction.

93)    Defendant's unauthorized use of the Mark and of the Association's institutional indicia was likely to cause confusion among actual and prospective purchasers, residents, investors, lenders, and other market participants in the diaspora purchaser and investor community of New York residents of Dominican descent and elsewhere in the United States as to whether Defendant's statements and demands were authorized by, affiliated with, sponsored by, approved by, or otherwise attributable to Plaintiff Ballantine as the sole owner of the Mark and exclusive developer of the Enterprise. Defendant's use of the Jamaca de Dios name, Association authority, and development-related communications was likely to cause prospective purchasers, investors, lenders, and commercial partners in the New York metropolitan area, including members of the

47

Dominican diaspora, to believe that Defendant was affiliated with, connected to, sponsored by, approved by, or authorized to speak for the Jamaca de Dios development and its related commercial activities. Plaintiff Ballantine's allegation of likely confusion among that United States-linked market is supported by direct evidence of actual confusion among persons better positioned than ordinary U.S.-resident purchasers to understand the Enterprise's institutional structure: the President of the City Council of Jarabacoa, who is based in Jarabacoa, has known Plaintiff Ballantine for more than fifteen years, and has been present at the Jamaca de Dios complex dozens of times through Plaintiff Ballantine's continuous development and administration of the Enterprise, was nonetheless confused as to the affiliation, connection, or association Defendant was claiming with the Enterprise, and as to the origin, sponsorship, or approval Defendant was claiming for his commercial communications. The actual confusion of a person with that depth of familiarity with the parties supports the inference that ordinary U.S.-resident purchasers, investors, and lenders, who lack that familiarity, were a fortiori likely to be confused by the same communications. That confusion produced specific commercial consequences: the collapse of an active engagement with a repeat New York-based purchaser; the withdrawal of Mr. Klein from the Mountain Lodge development opportunity; the foreclosure of the SmartWell Health wellness collaboration with Mr. Delgado; the blockage of the contingent $150,000 Mountain Lodge milestone payment; and the continuing impairment of Plaintiff Ballantine's developer status and Mark goodwill within the United States-linked purchaser and investor community.  Actual confusion is further supported by customers of the Jamaca de Dios restaurant component of the Enterprise.  Immediately following the May 18, 2025 publications, customers contacted the restaurant operator and restaurant personnel asking whether the restaurant was safe, whether it was closing, whether Jamaca de Dios was dangerous, or whether they should

48

avoid visiting, and many believed the restaurant had been formally condemned or shut down by the Dominican government.  Approximately thirty percent of the restaurant's 2025 reservation records carried New York or New Jersey area codes, within the same Diaspora Market toward which Defendant's campaign was directed.

94)     Defendant's false-designation conduct occurred in and affected United States commerce. Defendant directed the April 4, 2025 letter, the December 8, 2025 letter, and the March 3, 2026 invoice from his United States domicile in Rye, New York, and conceived and directed the May 18, 2025 publication campaign from his United States domicile and through his United States-based commercial and personal operations. On May 15, 2025 Defendant invoked the Jamaca de Dios commercial identity on United States soil at the Banreservas trade show in Washington Heights, New York. The May 18, 2025 publication campaign was disseminated within the United States by controlandoelejido.com, a Spanish-language digital media outlet headquartered in the Bronx, New York, which self-identifies on its masthead as "Tu portal digital dominicano en New York" and serves the Dominican-American community of Washington Heights, the Bronx, and the greater New York metropolitan area. Controlandoelejido's publication of the campaign sourced to the Association of Owners of Jamaca de Dios constituted a domestic use, by a domestic publisher, of the Mark and the Association's institutional indicia, in commerce within the United States, in connection with goods and services covered by the Mark. The unauthorized use was further disseminated through major social media platforms with a combined follower base exceeding 8.5 million people and through Spanish-language outlets self-identifying their target audience as including the United States diaspora. The materials remain accessible within that United States-linked market as of the date of this filing.

95)     As a direct and proximate result of Defendant's misconduct, Plaintiff Ballantine was injured in his business reputation and in his present and future sales. Those injuries include impairment of Plaintiff Ballantine's exclusive right to control use of the Mark in commerce; impairment of the goodwill of the Mark within the diaspora purchaser and investor community of New York residents of Dominican descent; the collapse of an active engagement with a repeat New York-based purchaser; the withdrawal of Mr. Klein from the Mountain Lodge development opportunity; the foreclosure of the SmartWell Health wellness collaboration with Mr. Delgado; the continuing blockage of the contingent $150,000 Mountain Lodge milestone payment; devaluation of the Mountain Lodge component and surrounding lots; loss of builder profit on the Mountain Lodge expansion; and enterprise-value impairment flowing from the continuing distribution of the challenged communications within the United States-linked market on a development-wide basis.  Plaintiff's injuries fall withing the zone of interests.

96)     Defendant's use of the Mark and of the Association's institutional indicia was willful and was intended to harm Plaintiff Ballantine. Defendant had actual knowledge of the contractual limitation on the Association's authority under the 2015 Administration Agreement, openly rejected that limitation, and acted in conscious disregard of it. Defendant's subsequent attempt on July 5, 2025 to retroactively ratify his April 22, 2025 self-appointment through a sparsely attended extraordinary general assembly evidences Defendant's own awareness that the April 22 self-appointment and the institutional-authority conduct that followed were unauthorized when undertaken. Defendant continued to invoke the Association's institutional credential after the underlying registration had expired and could not be recovered. Defendant has not retracted any of the challenged communications and remains in active use of the lapsed designation as of the date of this filing.

97)     This case is exceptional within the meaning of 15 U.S.C. § 1117(a) for the reasons set forth in Count I above.

## COUNT III

### Tortious Interference with Existing Contract

98)     Plaintiffs repeat and reallege each and every allegation set forth in the Complaint, including the Common Factual Allegations, as if fully set forth herein.

99)     Under New York law, a tortious interference with existing contract claim requires (a) a valid and enforceable contract between the plaintiff and a third party, (b) the defendant's knowledge of that contract, (c) the defendant's intentional procurement of the third party's breach without justification, and (d) actual damages resulting from the breach or impairment.

100)    At all relevant times, Plaintiff Ballantine held a valid and enforceable contractual relationship with Mr. José Lixander Mendoza Garzón, the operator of the Jamaca de Dios restaurant, and with the company controlled by Mr. Mendoza, under which the company was obligated to pay to Plaintiff Ballantine personally a contingent capital payment of $150,000 upon completion of the Mountain Lodge structure (the "Mendoza Milestone Contract"). The Mendoza Milestone Contract is a valid and enforceable contract.

101)    Defendant had actual knowledge of the Mendoza Milestone Contract and of its $150,000 milestone payment trigger. On or about May 24, 2025, Plaintiff Ballantine informed Defendant in writing of the specific contractual relationship between Plaintiff Ballantine and the operator of the Jamaca de Dios restaurant, including that the Mountain Lodge construction would trigger a $150,000 milestone payment to Plaintiff Ballantine under that contract.

102)    Defendant intentionally and without justification engaged in conduct designed to impair, frustrate, and prevent performance of the Mendoza Milestone Contract. Specifically, on

51

December 8, 2025 — more than six months after Plaintiff Ballantine had informed Defendant in writing of the milestone payment — Defendant transmitted from his New York domicile to local municipal authorities a formal letter on Association letterhead formally opposing the very Mountain Lodge construction whose completion would trigger the milestone payment. Defendant's December 8, 2025 letter caused the Municipality's ministerial processing of the routine clerical construction-tax payment owed on the Mountain Lodge structure to be paused, blocking completion and frustrating the trigger of the milestone payment. Defendant's December 8, 2025 letter was unauthorized as alleged in Count II of the Complaint and was therefore not justified by any institutional authority. Defendant's May 24, 2025 written communication — stating, with reference to the Mountain Lodge expansion and the restaurant operator, "You will make him stronger, and a bigger enemy" — confirms that Defendant's opposition to the Mountain Lodge expansion was based on the acquisition-protective objective of keeping the operator commercially weakened, not on any technical or environmental concern.

103)    As a direct and proximate result of Defendant's intentional interference, the Mendoza Milestone Contract's $150,000 milestone payment to Plaintiff Ballantine has been blocked since the Municipality's pausing of routine clerical processing following Defendant's December 8, 2025 letter, and remains blocked as of the date of this filing. Plaintiff Ballantine's routine developer submissions to the Municipality of Jarabacoa for the Mountain Lodge component were pending before April 4, 2025. The Municipality's processing of those submissions had been performed for Plaintiff Ballantine without incident for more than two decades as non-discretionary ministerial acts. Following Defendant's April 4, 2025 letter, the Municipality's processing of Plaintiff Ballantine's lot-layout and subdivision-record submission was paused for the first time. Following Defendant's December 8, 2025 letter, the Municipality's

processing of the routine clerical construction-tax payment owed on the Mountain Lodge structure was likewise paused.  Both pauses remain administratively silent as of the date of this filing.  The Mendoza Milestone Contract's performance window for the contingent $150,000 payment expires at the end of 2027.  The interference is not a single act; it is a continuing course of conduct, beginning with the April 4, 2025 letter, escalating through the December 8, 2025 letter, and continuing to this day.  On the present trajectory, the interference is materially obstructing and commercially and administratively foreclosing timely completion of the Mountain Lodge structure within the 2027 performance window.  The $150,000 milestone payment is not merely delayed; on the trajectory Defendant has created and continues to maintain, it is structurally foreclosed.  The structural foreclosure constitutes actual damages to Plaintiff Ballantine.  The interference of Defendant's conduct has progressively consumed and continues to consume the contractually available performance window for the milestone payment. The blockage and the continuing consumption of the performance window constitute actual damages to Plaintiff Ballantine. Defendant's conduct was undertaken with malice and with willful, wanton, and conscious disregard for Plaintiff Ballantine's contractual rights, supporting an award of punitive damages.

### COUNT IV

**Tortious Interference with Prospective Business Relations**

104)    Plaintiffs repeat and reallege each and every allegation set forth in the Complaint, including the Common Factual Allegations, as if fully set forth herein.

105)    Under New York law, a tortious interference with prospective business relations claim requires (a) a business relationship between the plaintiff and a third party, (b) the defendant's knowledge of that relationship and intentional interference with it, (c) the defendant's use of wrongful means or action solely out of malice, and (d) injury to the relationship. Wrongful means

53

include physical violence, fraud, misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure.

106)    Plaintiff Ballantine had identifiable business relationships and reasonable expectancies with specific, identified third parties. Those relationships included: (i) an active engagement with a repeat New York-based purchaser regarding an additional acquisition; (ii) an active investment relationship with Mr. Edward Klein regarding the form and structure of Mr. Klein's investment in the Mountain Lodge development; (iii) an active, integrated, on-site wellness center collaboration with Mr. Karim Delgado, a United States citizen and founder of SmartWell Health, who relocated from the United States to the Dominican Republic to lead an integrated wellness-center component within the Jamaca de Dios complex in active collaboration with Plaintiff Ballantine; received economic compensation from Plaintiff Ballantine for work performed; and provided wellness treatment services to clients at the property, including to Defendant himself on multiple occasions.  Following the May 18, 2025 campaign, Mr. Delgado withdrew from the collaboration and from Jamaca de Dios and the campaign permanently foreclosed his intended return; (iv) ongoing prospective relationships with the diaspora purchaser and investor community of New York residents of Dominican descent that has constituted a recurring and established United States-linked market for the Mark and the Enterprise for more than twenty-one years; and (v) an active prospective Mountain Lodge construction relationship with David Almanzar, identified in ¶34 above, who had previously been paid by Plaintiff Ballantine for engineered soil studies, engineering and structural designs of the Mountain Lodge structure, and had finalized a construction budget for the project; Mr. Almanzar was, as of May 15, 2025, the active candidate to construct the Mountain Lodge.  Defendant had direct personal knowledge of the prospective relationship and met with Mr. Almanzar and Plaintiff Ballantine at

54

Banreservas on May 15, 2025.  Three days later, the May 18, 2025 publication campaign foreclosed the prospective relationship.

107)    Defendant had knowledge of those business relationships and of the New York-resident Dominican-American purchaser community as Plaintiff Ballantine's established United States-linked market, and intentionally interfered with each of them through the conduct alleged in the Common Factual Allegations — including the May 17, 2025 communications to senior Dominican government officials, the May 18, 2025 publication campaign disseminated into the New York-resident Dominican-American purchaser community, the December 8, 2025 letter, and the March 3, 2026 invoice.

108)    Defendant's interference was effected through wrongful means recognized under New York law, including: (i) the publication of false statements of fact concerning Plaintiff Ballantine and the Enterprise within the meaning of Counts V and VI; (ii) commercial disparagement of the Mark, the Enterprise, and Plaintiff Ballantine's personal commercial reputation; (iii) the misrepresentation of institutional authority and the unauthorized invocation of institutional indicia within the meaning of Count II; (iv) the false attribution of expert opinions to Ministry of Environment personnel that those personnel did not in fact provide, and the false representation that four named Dominican institutions had "verified in situ the veracity" of Defendant's allegations as pleaded at ¶¶44 and 45; and (v) the deliberate selection and presentation of years-old photographs as current visual evidence of conditions Defendant knew did not exist. and (vi) the institutional submissions to senior Dominican government officials and to eight Dominican government agencies, none of which confirmed any of Defendant's claims.  In the alternative, Defendant's interference was undertaken solely out of malice toward Plaintiff Ballantine, motivated by Defendant's documented acquisition objective toward the targeted

commercial components of the Enterprise rather than by any legitimate business interest of his own. Either ground—wrongful means or sole malice—independently satisfies the New York standard.

109)    As a direct and proximate result of Defendant's wrongful interference, the prospective business relationships identified in ¶103 above were injured: the engagement with the repeat New York-based purchaser collapsed; Mr. Klein withdrew from the Mountain Lodge development opportunity; Mr. Delgado withdrew from the SmartWell Health collaboration and the campaign permanently foreclosed his intended return to Jamaca de Dios; and the goodwill and commercial standing of the Mark and the Enterprise within the diaspora purchaser and investor community of New York residents of Dominican descent were impaired. The damages claimed under this Count are capital opportunity losses, diminution of the Mark's commercial value within the diaspora purchaser community, and joint impairment of personal commercial standing, plus such other and further damages as may be proven at trial. Defendant's conduct was undertaken with malice and with willful, wanton, and conscious disregard for the rights of Plaintiffs, supporting an award of punitive damages.

## COUNT V

### Trade Libel and Commercial Disparagement

110)    Plaintiffs repeat and reallege each and every allegation set forth in the Complaint, including the Common Factual Allegations, as if fully set forth herein.

111)    Under New York law, a trade libel and commercial disparagement claim requires (a) a false and disparaging statement concerning the plaintiff's product, business, or commercial subjects in which the plaintiff has a property interest, (b) publication to a third party with malice,

56

(c) intent or reasonable expectation that the publication would result in pecuniary loss, and (d) special damages.

112)    The publications and communications alleged in the Common Factual Allegations falsely disparage commercial subjects in which Plaintiff Ballantine holds personal property and capital interests, including: the JAMACA DE DIOS JARABACOA Mark; the Jamaca de Dios development as a marketed luxury mountain destination; the Mountain Lodge expansion component; and the contingent $150,000 Mountain Lodge milestone payment. Each disparaging statement is false as alleged in the Common Factual Allegations.

113)    Defendant published the disparaging statements to third parties with actual malice, established by the facts pleaded at ¶122 of Count VI below, which are incorporated by reference. The publications were disseminated to approximately thirty Dominican-language news outlets, to social media accounts with a combined follower base exceeding 8.5 million followers, to eight Dominican government institutions, and to local municipal authorities through the April 4, 2025 letter, the December 8, 2025 letter, and the March 3, 2026 invoice on Association letterhead, as alleged in the Common Factual Allegations.

114)    Defendant published the disparaging statements with the intent or reasonable expectation that the publications would result in pecuniary loss to Plaintiff Ballantine and to the commercial subjects in which Plaintiff Ballantine holds personal property and capital interests. Defendant's May 24, 2025 written communication confirms his commercial-acquisition objective toward the restaurant component the campaign had targeted six days earlier and his economic motive in depressing the commercial valuation of that component. Defendant's December 8, 2025 letter formally opposed the very Mountain Lodge construction whose completion would trigger the $150,000 milestone payment to Plaintiff Ballantine.

115) Plaintiffs have suffered the following special damages flowing directly from Defendant's disparaging publications, each of which is itemized with particularity:

(a) The blockage of the contingent capital payment of $150,000 owed to Plaintiff Ballantine personally upon completion of the Mountain Lodge structure, contractually triggered by Mountain Lodge completion within an allotted performance window expiring at the end of 2027. Following Defendant's December 8, 2025 letter formally opposing the Mountain Lodge construction whose completion would trigger the milestone payment, the Municipality of Jarabacoa's processing of the routine clerical construction-tax payment owed on the Mountain Lodge structure was paused. As of the date of this filing, the milestone payment remains blocked.

(b) The withdrawal of Mr. Edward Klein from the Mountain Lodge development opportunity. Mr. Klein is a successful and lifelong commercial and residential real estate investor and Plaintiff Ballantine's longstanding United States-based co-titleholder of the Mountain Lodge property. Mr. Klein and Plaintiff Ballantine were in active discussions regarding the form and structure of Mr. Klein's investment and participation in the Mountain Lodge development. Mr. Klein withdrew after observing the May 18, 2025 publication campaign and its market impact. The foreclosure of this capital relationship constitutes a material capital opportunity loss to Plaintiff Ballantine.

(c) The foreclosure of the SmartWell Health wellness collaboration with Mr. Karim Delgado. Mr. Delgado is a United States citizen and the founder of SmartWell Health, who relocated to the Dominican Republic specifically to lead the development of a wellness center component within the Jamaca de Dios complex in active

collaboration with Plaintiff Ballantine. Following the May 18, 2025 publication campaign, Mr. Delgado withdrew from the collaboration, and the campaign permanently foreclosed his intended return to Jamaca de Dios. The foreclosure of this capital relationship constitutes a material capital opportunity loss to Plaintiff Ballantine.

(d)     The collapse of an active engagement with a repeat New York-based purchaser of the Enterprise. In the days immediately preceding May 18, 2025, that purchaser, who had previously acquired a villa within the Development, was actively engaged with Plaintiff Ballantine regarding an additional acquisition, including offer, counter-offer, and financing terms. Following the May 18 publication campaign, the active relationship collapsed, and a subsequent discounted offer for a titled contiguous lot was rejected. The foreclosure of the additional acquisition constitutes a capital opportunity loss to Plaintiff Ballantine.

(e)     The diminution in the fair market value of the JAMACA DE DIOS JARABACOA Mark, a personal capital asset held by Plaintiff Ballantine. The campaign converted the Mark's twenty-one-year identity, in the diaspora purchaser and investor community of New York residents of Dominican descent, from premium mountain destination to imminent mountain catastrophe. The diminution in fair market value, including the cost of measures reasonably required to restore the Mark's commercial standing, constitutes a quantifiable capital impairment of the personal capital asset.

(f)     The thirty percent workforce reduction at the company controlled by the operator of the Jamaca de Dios restaurant, the collapse of the New York and New

59

Jersey-based reservations following the May 18 publication campaign, and a material gross-sales decline in the twelve-month period following publication compared to the twelve-month period immediately preceding it, each as documented in contemporaneous business records of the restaurant operator.  The disruption is pleaded as direct evidence of the diminution in goodwill and commercial standing of the JAMACA DE DIOS JARABACOA Mark and the Enterprise within the Diaspora Market following the May 18, 2025 publications.

116)    Plaintiffs Michael J. Ballantine and Lisa Ballantine, jointly, have additionally suffered damages to their personal joint commercial standing in the diaspora purchaser and investor community of New York residents of Dominican descent, in amounts to be proven at trial. The damages claimed under this Count are capital damages — capital opportunity losses, capital asset diminution, foregone capital appreciation, and contingent capital payments blocked — plus such other and further damages as may be proven at trial. Defendant's conduct was undertaken with malice and with willful, wanton, and conscious disregard for the rights of Plaintiffs, supporting an award of punitive damages.

## COUNT VI

### Defamation Per Se

117)    Plaintiffs repeat and reallege each and every allegation set forth in the Complaint, including the Common Factual Allegations, as if fully set forth herein.

118)    Under New York law, a defamation per se claim requires (a) a false statement of fact concerning the plaintiff, (b) publication to a third party without privilege, (c) fault rising to at least negligence (and, where the plaintiff is a public figure or the matter is one of public concern,

60

actual malice), and (d) a statement that falls within a recognized per se category, including statements that tend to injure the plaintiff in his trade, business, or profession.

119)   The publications and communications alleged in the Common Factual Allegations contain false statements of fact concerning Plaintiff Michael J. Ballantine and the Jamaca de Dios development, restaurant, and Mountain Lodge expansion. Plaintiff Ballantine is identified by name in the publications as the developer; the statements are therefore "of and concerning" him as a matter of pleading. The statements include, without limitation, the imminent-collapse and Jet Set comparison statements, the fabricated 14,000-square-meter clearing and false attribution to Ministry of Environment experts, the false destruction-of-water-springs allegation, the false assertion of permit-review and title-review authority, the false absence-of-permits and demolition-demand allegations, the fabricated four-institution verification claim, the false "sold the entire project" and "legally lacks purpose" assertions, and the false visual presentation through years-old photographs presented as current conditions, each as alleged in the Common Factual Allegations and incorporated herein. Each such statement was false. None has been retracted.

120)   Defendant published, caused to be published, or directed the publication of each such statement to third parties, including approximately thirty Dominican-language news outlets and social media accounts with a combined follower base exceeding 8.5 million followers, and to local municipal authorities, eight Dominican government institutions, and senior Dominican government officials, as alleged in the Common Factual Allegations.

121)   Defendant's December 8, 2025 letter and March 3, 2026 invoice constitute separate publications of the same false assertions concerning Plaintiff Ballantine's developer authority, the Enterprise, and the Mark, each issued under the institutional identity Defendant controls and each

actionable as a new and distinct tort within the applicable limitations periods for the state-law counts pleaded herein.

122)    Defendant published the false statements with actual malice — with knowledge of their falsity, or with reckless disregard for whether they were false or true. Actual malice is established by, among other facts pleaded in the Common Factual Allegations and incorporated herein: (i) Defendant's three-plus years of continuous direct dialogue with Plaintiff Ballantine without ever raising the structural, environmental, or permit concerns first asserted in the April 4, 2025 letter and the May 18, 2025 publications; (ii) the May 14–16, 2025 Banreservas trade show meeting in Washington Heights, New York at which Defendant raised no concern in the presence of the Mountain Lodge structural engineer or in response to The Elements principal's on-site representations; (iii) the false attribution of expert opinions to Ministry of Environment personnel that did not exist; (iv) the deliberate selection and presentation of years-old photographs as current visual evidence of conditions Defendant knew did not exist; (v) Defendant's May 24, 2025 written acquisition-mechanics communication to Plaintiff Ballantine, six days after the campaign launched, confirming Defendant's commercial-acquisition objective toward the targeted restaurant component; (vi) Defendant's continuing refusal to retract the publications notwithstanding the eight-agency findings, the institutional refutation published in the same media ecosystem, and the duly elected City Council's rejection of the publications' claims; (vii) the corroborated falsity of the four-institution verification claim pleaded at ¶¶ 44 and 45, above—including the restaurant operator's personal knowledge that none of the four institutions contacted him before publication and the Chief of the Jarabacoa Fire Department's independent confirmation that the Cuerpo de Bomberos was not contacted before publication. and (viii) Defendant's contemporaneous knowledge on May 15, 2025 that Mr. Almanzar, identified in ¶34 above, was actively building

62

The Elements at the entrance of the same mountainside, and that Plaintiff Ballantine was in active prospective Mountain Lodge discussions with Mr. Almanzar on the same mountainside; Defendant raised no safety concern at the May 15 meeting and disseminated imminent-collapse publications three days later.

123) The statements fall within the per se category for statements that tend to injure the plaintiff in his trade, business, or profession. The statements impute to Plaintiff Ballantine fraud, dishonesty, professional misconduct, incapacity, and unfitness to perform the trade and profession in which he has been continuously engaged for more than twenty-one years as the publicly-identified founder, developer, administrator, and Mark owner of the Enterprise. They impute the construction of structurally unsafe buildings, the construction of buildings without permits, the destabilization of mountain terrain, ongoing destructive environmental conduct, and the absence of legal authority to operate the Development.

124) Damages are presumed under New York law for statements falling within the per se category. Plaintiff Ballantine has additionally suffered actual damages including impairment of the goodwill of the Mark, devaluation of the Mark as a personal capital asset, impairment of his personal commercial reputation, the collapse of an active engagement with a repeat New York-based purchaser, the withdrawal of Mr. Klein from the Mountain Lodge development opportunity, the foreclosure of the SmartWell Health collaboration with Mr. Delgado, and the continuing blockage of the contingent $150,000 Mountain Lodge milestone payment, each as pleaded in the Common Factual Allegations. Plaintiffs Michael J. Ballantine and Lisa Ballantine, jointly, have additionally suffered damages to their personal joint commercial standing in the diaspora purchaser and investor community of New York residents of Dominican descent. Defendant's

conduct was undertaken with malice and with willful, wanton, and conscious disregard for the rights of Plaintiffs, supporting an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Ballantine respectfully requests that this Court enter judgment against Defendant and grant the following relief on the Lanham Act counts. Relief on Counts III through VI is requested in the prayer for relief accompanying those counts.

A.      Compensatory damages under 15 U.S.C. § 1117(a) in an amount to be proven at trial, sufficient to compensate Plaintiff Ballantine for the commercial injury caused by Defendant's false advertising, false designation, and unauthorized use of the Jamaca de Dios name and the Association's institutional indicia, including damages to the goodwill of the Mark, damages to Plaintiff Ballantine's personal commercial reputation as developer, and the specific transactional, milestone-payment, builder-profit, and enterprise-value losses pleaded above on a development-wide basis;

B.      Disgorgement of Defendant's profits under 15 U.S.C. § 1117(a), including any profits or commercial benefits obtained through Defendant's false statements, unauthorized use of the Jamaca de Dios name, and assertion of false institutional authority;

C.      Enhanced damages pursuant to 15 U.S.C. § 1117(a) in an amount the Court determines appropriate, given the willful character of Defendant's conduct, the pre-announced and coordinated nature of the campaign, the false attribution of expert opinions to Ministry of Environment personnel, and Defendant's continuing use of the Jamaca de Dios name and institutional identity after the eight-agency institutional investigation had failed to confirm any of the publications' claims;

D.      Plaintiff Ballantine's reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a) on the ground that this is an exceptional case;

E.      A permanent injunction under 15 U.S.C. § 1116(a) restraining Defendant, his agents, employees, attorneys, and any persons acting in concert with him from using the Jamaca de Dios name, the Mark, the Association's institutional indicia, or any colorable

64

variation thereof in commercial or market-facing communications that falsely imply authority over, affiliation with, sponsorship by, or approval from Plaintiff Ballantine or the Enterprise;

F.　　Corrective advertising or corrective-notice relief under 15 U.S.C. § 1116, in a form and through channels the Court deems appropriate to remediate the continuing commercial injury caused by the unretracted publications;

G.　　On Count III (Tortious Interference with Existing Contract): an award of damages reflecting the blocked contingent capital payment of $150,000 owed under the Mendoza Milestone Contract and the continuing consumption of the contractual performance window,

H.　　On Count IV (Tortious Interference with Prospective Business Relations): an award of capital damages reflecting the foreclosed capital opportunities itemized in this Count, the diminution of the Mark's commercial value within the diaspora purchaser community, and joint impairment of personal commercial standing;

I.　　On Count V (Trade Libel and Commercial Disparagement): an award of capital damages reflecting the itemized special damages pleaded in this Count — including the contingent capital payment of $150,000 blocked, the foregone capital opportunity of the Mountain Lodge development relationship with Mr. Klein, the foregone capital opportunity of the SmartWell Health wellness collaboration, and the diminution in fair market value of the JAMACA DE DIOS JARABACOA Mark — plus joint impairment damages;

J.　　On Count VI (Defamation Per Se): an award of presumed and actual damages in an amount to be proven at trial;

K.　　Compensatory damages on Counts III, IV, V, and VI, including a) the blocked $150,000 Mountain Lodge milestone payment within the 2027 performance window, plus lost builder profit, devaluation of surrounding lots, and impairment of the Phase Two development pipeline; b) foregone capital opportunities including the Klein investment relationship, the Delgado SmartWell Health collaboration, the repeat New York-based

purchaser relationship, and the Almanzar Mountain Lodge construction relationship; c) diminution in the fair market value of the JAMACA DE DIOS JARABACOA Mark; (d) enterprise-value impairment; and e) joint impairment of personal commercial standing in the Diaspora Market.

L.    Punitive damages on Counts III, IV, V, and VI in an amount the Court determines appropriate, given Defendant's willful, malicious, and wanton conduct, including the fabricated four-institution verification claim, the false attribution of expert opinions to Ministry of Environment personnel, the presentation of years-old photographs as current conditions, the continuing refusal to retract after the eight-agency institutional refutation, and the continuing invocation of the lapsed institutional identity through the December 8, 2025 letter and the March 3, 2026 invoice.

M.    Pre-judgment and post-judgment interest as permitted by law, and Plaintiffs' costs of suit; and

N.    Such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: New York, New York
         June 24, 2026

THE LINDEN LAW GROUP, P.C.

*Jeffrey Benjamin, Esq*

230 Park Avenue, 3rd Floor
New York, New York 10169
Tel (212) 655-9536
*Attorneys for Plaintiffs*

66

## VERIFICATION

STATE OF FLORIDA          )
                          : ss
COUNTY OF COLLIER         )

MICHAEL BALLANTINE and LISA BALLANTINE each being duly sworn, depose and say:

That deponents are the Plaintiffs herein; deponents have read the foregoing **VERIFIED FIRST AMENDED COMPLAINT** and knows the contents thereof; that the allegations are true and accurate to the best of the deponents' own knowledge, except as to the matters therein stated to be alleged upon information and belief, and that as to those matters, deponents believe to be true.

We affirm this 23rd day of June, 2026, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

_____          6/23/26
MICHAEL BALLANTINE

_____          6-23-26
LISA BALLANTINE

2